_____

No. 95-1468EA
_____

Harold Summers,                        *
                                       *
            Appellant,                 *
                                       *   On Appeal from the United
     v.                                *   States District Court for
                                       *   the Eastern District
                                       *   of Arkansas.
Baptist Medical Center                 *
Arkadelphia,                           *
                                       *
            Appellee.                  *


_____

Submitted: April 9, 1996

Filed: August 5, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, HEANEY, McMILLIAN, FAGG, BOWMAN,
     WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, and
     MURPHY, Circuit Judges, en banc.
_____

RICHARD S. ARNOLD, Chief Judge.


     Harold Summers brought this case against Baptist Medical Center
Arkadelphia (Baptist), a hospital in Arkadelphia, Arkansas.  The case
arises under the Emergency Medical Treatment and Active Labor Act of 1986
(EMTALA), 42 U.S.C. § 1395dd.  Summers claims that he was not appropriately
screened for treatment when he was brought in to Baptist's emergency room
after a deer-hunting accident.  The District Court[1] granted Baptist's
motion for summary

_____

[1]The Hon. William R. Wilson, Jr., United States District Judge
for the Eastern District of Arkansas.

judgment and dismissed the complaint. Summers appealed, and a panel of this Court reversed and remanded for trial, one judge dissenting. <u>Summers v. Baptist Medical Center Arkadelphia</u>, 69 F.3d 902 (8th Cir. 1995). We granted Baptist's suggestion for rehearing en banc, thus vacating the opinion and judgment of the panel. Having heard oral argument before the Court en banc, we now affirm the judgment of the District Court. We hold that something more than, or different from, ordinary negligence in the emergency-room screening process must be shown to make out a federal claim under EMTALA.

I.

We state the facts in the light most favorable to the plaintiff, the party opposing summary judgment. On October 25, 1992, Summers fell out of a tree stand while deer hunting near Arkadelphia. An ambulance brought him to Baptist's emergency room. A nurse took the medical history, and a physician saw Summers immediately. Summers testified that the doctor pressed "on my stomach and stuff." Deposition of Harold Summers, Record on Appeal (R.) 43. Summers said he "was hurting in my chest real bad and I was hearing this popping noise every time I breathed . . .. I [told the doctor] I was hurting [in my chest] . . .. I heard this snapping, and he told me I was having muscle spasms." <u>Ibid</u>. Summers also complained of pain in his back.

The emergency-room physician ordered four x-rays of the patient's spine. (Other routine tests were done, but they are not material for present purposes.) Both the thoracic and the lumbar spine were covered. The physician recalls the patient's complaining of pain in his back, and Baptist conceded in the District Court that Summers complained of chest pain, but the doctor testified that Summers did not complain of pain in the front part of his chest. The doctor pressed on the front and back of the chest, noticed no difficulty in breathing, and heard no popping or

-2-

crackling-type sounds on listening to the chest, Deposition of G.H. Ferrell, Jr., M.D., R. 137-38. The doctor did not remember the patient's saying he could hear popping-type sounds, R. 138, and felt or heard nothing to indicate a broken sternum, R. 139. "If he had complained of pain in the sternum or pain in the ribs, we would have x-rayed those." R. 144.

No x-rays of the chest were taken. The spinal x-rays showed, in the opinion of the physician at Baptist, only an old break at the eighth thoracic vertebra. Summers was told that he was suffering from muscle spasms. He said he was in pain and asked to be admitted to the hospital. He was told no. Summers then said he had insurance and $1,200 in cash, in case the hospital felt his admission would cause some sort of financial problems, but he was still refused admission. The doctor thought he did not need to be admitted to the hospital. Summers was given pain injections and discharged with instructions to see a doctor at home (Jonesboro, Arkansas) the next day. He was loaded into a pick-up truck and had to endure the five-hour drive home in pain.

The next day Summers felt too sore to get out of bed, and did not go to his family doctor. The day after that, though, October 27, he was in such pain that he went by ambulance to St. Bernard's Regional Medical Center. He was given, among other tests, a chest x-ray. This x-ray was difficult to read, so a CT (computerized tomography) scan was done. The scan revealed a fresh break of the seventh thoracic vertebra. In addition, the x-ray showed a broken sternum and a broken seventh rib. According to Rebecca Barrett-Tuck, M.D., a Jonesboro neurosurgeon, the chest injury "certainly does constitute a life threatening injury," Affidavit of Dr. Barrett-Tuck, R. 115. Summers was kept in the hospital at Jonesboro for 14 days, some of that time in intensive care. It is fair to conclude that if a chest x-ray had been taken at Arkadelphia, the broken breast-bone and rib would have been discovered, Summers would have been hospitalized at once, and the

patient would have been spared at least two unnecessary days of anxiety and pain.

II.

The plaintiff's main claim is that, on the basis of this record, a jury could properly find Baptist had failed to "provide for an appropriate medical screening examination within the capability of [its] . . . emergency department . . .." 42 U.S.C. § 1395dd(a). Baptist agrees that patients complaining of pain in the front of their chest, or of snapping or popping noises when breathing, would normally be given a chest x-ray. The jury could find that Summers did so complain, but he was not given a chest x-ray. His screening examination was therefore not "appropriate."

In order to consider this argument, we first set out the relevant part of the statute and then describe how courts have interpreted it. It is always important to pay close attention to the words of a statute, or any other document that one must construe, so we begin by setting out those words:

**§ 1395dd.  Examination and treatment for emergency medical conditions and women in labor**

**(a)  Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the

-4-

meaning of subsection (e)(1) of this section) exists.

The statute applies to hospitals which have executed provider agreements under the Medicare Program, and there is no dispute that Baptist is such a hospital. The operative language of the statute for present purposes is that such a hospital "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." What is meant by the word "appropriate"? One possible meaning, perhaps the most natural one, would be that medical screening examinations must be correct, properly done, if not perfect, at least not negligent. It would be easy to say, for example, simply as a matter of the English language, that a negligently performed screening examination is not an appropriate one. So far as we can determine, however, no court has interpreted the statute in such an expansive fashion, and it is easy to understand why.

First of all, the purpose of the statute was to address a distinct and rather narrow problem -- the "dumping" of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them. A patient is "dumped" when he or she is shunted off by one hospital to another, the second one being, for example, a so-called "charity institution." The legislative history underlying the enactment of EMTALA, which we think proper to consult in order to interpret the ambiguous term "appropriate," makes this limited purpose clear. See, e.g., H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985), reprinted in 1986 U.S. Code Cong. & Admin. News 579, 605, where the following passage appears:

> Explanation of provision.--The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with

emergency conditions if the patient does not have medical insurance. The Committee is most concerned that medically unstable patients are not being treated appropriately. There have been reports of situations where treatment was simply not provided. In numerous other instances, patients in an unstable condition have been transferred improperly, sometimes without the consent of the receiving hospital.

We must be mindful, on the other hand, that it is the statute, and not a committee report, that is signed by the President and has therefore become law. We do not cite the committee report or the evident purpose behind the statute in support of a theory that a person must show that he has been "dumped" in order to bring an action under EMTALA. The statute clearly applies to "any individual," 42 U.S.C. § 1395dd(a) whether insured or not, and, therefore, the fact that Baptist's motivation in this particular case was obviously not to dump an uninsured or indigent patient does not defeat the plaintiff's action. We have no doubt that "dumping" is covered by the statute, and that a refusal to screen a patient because he or she had no insurance would violate the statute, but other practices can violate it as well. The question is not whether a plaintiff has insurance, or whether he was refused screening because of lack of insurance, but, rather, whether he was afforded an "appropriate" medical screening examination.

So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms. The opinion of our panel in this very case, for example, affirms the general rule that

EMTALA is not a federal malpractice statute and it does not set a national emergency health care standard; claims of misdiagnosis or inadequate treatment are left to the state malpractice arena.

-6-

69 F.3d at 904. The courts have construed the statute in this rather conservative fashion, we suppose, out of sensitivity to policies of federalism. Congress can of course, within constitutional limits, federalize anything it wants to. Whether it chooses to do so is a matter of policy for it to decide, not us. But in construing statutes that are less than explicit, the courts will not assume a purpose to create a vast new realm of federal law, creating a federal remedy for injuries that state tort law already addresses. If Congress wishes to take such a far-reaching step, we expect it to say so clearly. This is the rule, generally speaking, in interpreting federal criminal statutes, see, e.g., United States v. Bass, 404 U.S. 336, 349-50 (1971), and we have applied it in the civil context as well, H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 495-96 (8th Cir.), cert. denied, 504 U.S. 957 (1992).

Decided cases uniformly support this approach to the interpretation of EMTALA. A good example is Chief Judge Wilkinson's excellent opinion in Vickers v. Nash General Hospital, Inc., 78 F.3d 139 (4th Cir. 1996). In Vickers, the Fourth Circuit carefully explains that EMTALA imposes only a limited duty on hospitals with emergency rooms. It is not a substitute for state-law malpractice actions. It does not guarantee proper diagnosis or provide a federal remedy for medical negligence.[2] "EMTALA `is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat.'" Id. at 142, quoting Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991). The law of this Circuit is to the same effect. Williams v. Birkeness, 34 F.3d 695, 697 (8th Cir. 1994) (appropriate medical screening does not mean correct diagnosis).

---

[2]Summers did not join a pendent state-law claim for medical negligence in his complaint.

One way of limiting the potentially sweeping scope of the statute's language is to require that a plaintiff prove some sort of improper motive in order to recover under EMTALA. As we have previously indicated, we do not agree that evidence of a purpose to "dump" a patient is required. Nor does the statute require any other particular motivation. In this sense, the statute is, as plaintiff argues, a strict-liability provision. If a hospital fails to provide an appropriate medical screening examination, it is liable, no matter what the motivation was for this failure. In this respect, we depart from the reasoning of <u>Cleland v. Bronson Health Care Group, Inc.</u>, 917 F.2d 266, 272 (6th Cir. 1990), which would require some showing of improper motivation, not necessarily involving indigency or lack of insurance, but including other improper reasons, for example, race, sex, drunkenness, or personal prejudice. We believe that any of these showings would suffice to make out a case of inappropriate screening, but we cannot agree that such evidence of improper motivation is essential. Again, the statute contains no such requirement, and every court of appeals, with the exception of the <u>Cleland</u> court, which has addressed the issue, has rejected the proposition that improper motive must be shown. <u>E.g.</u>, <u>Gatewood v. Washington Healthcare Corp.</u>, <u>supra</u>, 933 F.2d at 1041 n.3.

So, if improper motive is not required, and if the statute does not create a federal remedy for medical malpractice in emergency rooms, what does the statute do? Something more than or different from negligence must be shown, but what is that "something"? We have previously taken the position that the "something" required is lack of uniform treatment. <u>Williams v. Birkeness</u>, <u>supra</u>, 34 F.3d at 697. An inappropriate screening examination is one that has a disparate impact on the plaintiff. Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities. It is up to the hospital itself to determine what

its screening procedures will be.  Having done so, it must apply them alike to all patients.  Several other circuits have also so held, <u>Vickers v. Nash General Hospital, Inc.</u>, <u>supra</u>, 78 F.3d at 143; <u>Correa v. Hospital San Francisco</u>, 69 F.3d 1184, 1192-93 (1st Cir. 1995) <u>cert. denied</u>, 116 S. Ct. 1423 (1996); <u>Repp v. Anadarko Municipal Hospital</u>, 43 F.3d 519, 522 (10th Cir. 1994); <u>Holcomb v. Monahan</u>, 30 F.3d 116, 117 (11th Cir. 1994), and we now reaffirm this holding.

III.

As we understand the positions taken by both parties to this case[3] they would accept, at least in general, all of the principles so far laid out in this opinion.  Plaintiff, for example, concedes that he has to show non-uniform or disparate treatment in order to succeed.  He takes the position, however, that he has met this requirement.  According to the hospital's own admission, a patient complaining of snapping and popping noises in his chest would have been given a chest x-ray.  Plaintiff, as we must assume for purposes of this motion for summary judgment, did make just such a complaint, but was not given the chest x-ray.  He was therefore treated differently from other patients, and differently from the treatment prescribed by the hospital's normal screening process.  Therefore he is entitled to recover under EMTALA.

The argument has a surface appeal, and, indeed, the panel that initially heard this case adopted this very approach.  On reflection, we are not convinced.

The important point for us is that the very respect in which the plaintiff's screening is said to be non-uniform -- failure to

---

[3]We also have before us a brief amicus curiae filed by the Arkansas Hospital Association.  This brief has greatly aided our consideration of this appeal.

order a chest x-ray for a patient complaining of popping noises in his chest -- is nothing more than an accusation of negligence. We accept for purposes of this appeal from a summary judgment the proposition that Summers in fact made this complaint, and that the doctor did not hear him, or forgot what had been said. (There is no contention that the doctor deliberately failed to order a chest x-ray.) This may have been medical malpractice, but if it is also an EMTALA violation, that statute has been converted into a federal cause of action for a vast range of claims of medical negligence. It would almost always be possible to characterize negligence in the screening process as non-uniform treatment, because any hospital's screening process will presumably include a non-negligent response to symptoms or complaints presented by a patient. To construe EMTALA this expansively would be inconsistent with the principles and cases set out earlier in this opinion.

We find two recent cases helpful at this point. One is <u>Vickers v. Nash General Hospital, Inc.</u>, <u>supra</u>. There, the patient, Vickers, had fallen on his head. He went to the defendant hospital's emergency room. The physician there examined him and diagnosed him as suffering from lacerations of the scalp. These were repaired by stitches. X-rays of the cervical spine were taken and revealed no damage. Vickers was then discharged. Four days later, he died. He was found to have a broken skull, a tear in his cerebrum, and an epidural hematoma. On these facts, the Fourth Circuit held that no EMTALA claim was stated. The allegation, the Court thought, "ultimately present[s] [a] conventional charge[ ] of misdiagnosis, and . . . [its] reasoning would obliterate any distinction between claims of malpractice under state law and actions under EMTALA." 78 F.3d at 143.

The Court went on to explain:

> The flaw in this reasoning is its failure to
> take the actual diagnosis as a given.

-10-

> EMTALA is implicated only when individuals who are
> <u>perceived to have</u> the same medical condition
> receive disparate treatment; it is not implicated
> whenever individuals who turn out in fact to have
> had the same condition receive disparate treatment.
> The Act would otherwise become indistinguishable
> from state malpractice law. As a result, when an
> exercise in medical judgment produces a given
> diagnosis, the decision to prescribe a treatment
> responding to the diagnosis cannot form the basis
> of an EMTALA claim of inappropriate screening.

Id. at 144 (citation omitted).

The key phrase in this holding is "perceived to have." The emergency-room physician is required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have. So here, the physician, we must assume through inadvertence or inattention, did not perceive Summers to have cracking or popping noises in his chest, or pain in the front of his chest. This is why no chest x-rays were taken. In the medical judgment of the physician, Summers did not need a chest x-ray. Summers did receive substantial medical treatment. It was not perfect, perhaps negligent, but he was treated no differently from any other patient perceived to have the same condition.

<u>Correa v. Hospital San Francisco</u>, <u>supra</u>, is also persuasive. The case is essentially one of failure to screen a patient at all, and the Court upheld a jury verdict for the patient's survivors. In the course of its opinion, though, the Court carefully explains the limited scope of EMTALA:

> . . . EMTALA does not create a cause of action for
> medical malpractice . . . .. Therefore, a refusal to
> follow regular screening procedures in a particular
> instance contravenes the statute, . . . but faulty
> screening, in a particular case, as opposed to
> disparate screening or refusing to screen at all,
> does

-11-

not contravene the statute.

69 F.3d at 1192-93.  The case now before is, at most, one of "faulty screening."  We agree with the First Circuit that such a claim does not come within EMTALA.

In sum, we hold that instances of "dumping," or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA.  But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not.  The District Court was therefore correct to dismiss Summers's claim that the failure to give him a chest x-ray violated EMTALA.[4]

IV.

Plaintiff also advances, though with less emphasis, three other theories of EMTALA violation.  We shall now discuss each of them in turn.

1.  It is claimed that the hospital had no written screening procedures, and that this omission, in and of itself, is a violation of the screening provision of EMTALA, 42 U.S.C. § 1395dd(a).  The accusation may be unfair as a matter of fact.  Apparently there was no single piece of paper or manual captioned "Emergency Room Screening Procedures," but there were a number of forms routinely used by emergency-room personnel, and the practice

---

[4]In fairness to the plaintiff, we observe that Power v. Arlington Hospital Ass'n, 42 F.3d 851 (4th Cir. 1994), comes close, on its facts, to supporting his position.  We find the reasoning of the Fourth Circuit's later opinion in Vickers, which analyzes explicitly the problems of interpreting EMTALA that we have discussed in this opinion, more persuasive.

of the hospital clearly required that these forms be followed and filled out. In any event, the hospital did have a screening procedure, even if unwritten in part, and the statute makes no additional requirement. It says nothing about written procedures.

2. A violation of the same provision is claimed with respect to the taking of Summers's medical history. Part of the hospital's regular screening procedure, it is argued, is to take a complete and accurate medical history. This was not done in Mr. Summers's case, it is said. Plaintiff argues that "an adequate medical history would have consisted of knowing whether or not the patient was unconscious, how far he had fallen, what he had fallen on, the time he had fallen with reference to when he was being treated, and whether he had taken any pain medication from the time of the injury until time seen in the emergency room . . .. Appellee's personnel made none of these inquiries or findings during the emergency room examination." Brief for Appellant 9. A partial answer to this contention is that a good deal of the information mentioned had already been obtained by the emergency medical technicians who transported Summers to the hospital in an ambulance. In addition, we cannot see that any of these alleged omissions has any particular connection to the failure to discover the broken rib and sternum. And most basically, this sort of omission is the same kind of faulty-screening or negligent-screening theory that we have previously rejected.

3. Finally, Summers makes a claim under another provision of EMTALA, 42 U.S.C. § 1395dd(b)(1). This portion of the statute provides, in pertinent part, as follows:

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide . . . (A) . . . for such further medical examination and such treatment as may be required to stabilize the medical condition . . ..

The claim is that the hospital, before discharging Summers, did not take proper steps to stabilize his condition.  This claim must fail because, under the express wording of the statute, this portion of EMTALA applies only if "the hospital determines that the individual has an emergency medical condition . . ." (emphasis supplied).  Here, the hospital believed Summers was suffering from muscle spasms, not an emergency medical condition.  The duty to stabilize therefore never arose.  A hospital must have had actual knowledge of the individual's unstabilized emergency medical condition if a claim under § 1395dd(c) is to succeed.  Vickers v. Nash General Hospital, Inc., supra, 78 F.3d at 145; Urban v. King, 43 F.3d 523, 525-26 (10th Cir. 1994); Baber v. Hospital Corp. of America, 977 F.2d 872, 883 (4th Cir. 1992);  Cleland v. Bronson Health Care Group, Inc., supra, 917 F.2d at 268-69 (6th Cir. 1990).

V.

For the reasons given in this opinion, we believe the District Court acted correctly in granting the defendant's motion for summary judgment on Mr. Summers's claims under EMTALA.  The judgment of the District Court is therefore

Affirmed.

HEANEY, Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.

In affirming the dismissal of Summers' claim, the majority assumes facts against Summers' position and significantly limits the scope of the statute.  Under EMTALA, as plainly written, an individual who suffers harm as a direct result of a hospital emergency room's failure to follow appropriate medical screening procedures has a cause of action against the hospital.  42 U.S.C. §§ 1395dd(a), (d)(2)(A).  For the reasons stated in my original majority opinion, Summers v. Baptist Medical Center Arkadelphia, 69

-14-

F.3d 902 (8th Cir. 1995), I believe that Summers' claim presents a genuine issue of material fact that the district court should have permitted to go to the jury. Thus, I respectfully dissent.

## I.

It has never been my position that EMTALA establishes a vast range of claims for medical negligence. EMTALA has a much more limited application than state malpractice law: it applies only to emergency rooms of hospitals that have provider agreements under the Medicare program. EMTALA also does not establish a national standard of care. Rather, it requires hospitals to develop screening procedures to detect emergency medical conditions. As the majority recognizes, the statute does not mandate that the procedures be written and a hospital may make its procedures as detailed or as general as it sees fit. It is the hospital's obligation, however, to follow its established screening procedures for all patients who present with complaints to the emergency room. Failure to do so constitutes a prima facie violation of the federal statute. The more a hospital's established procedures are unwritten and loosely-defined--or essentially equivalent to "due care"--the more an EMTALA cause of action may overlap with a state medical malpractice claim.

The only evidence in this record of a hospital standard applicable to Summers' complaint is Dr. Ferrell's deposition testimony that had Summers complained of pain in the sternum or pain in the ribs, he would have x-rayed those regions. (R. 149.) As the majority notes, Baptist agrees that patients complaining of pain in the front of their chest, or of snapping or popping noises when breathing, would normally be given a chest x-ray. Maj. Op., supra at 4. The majority, considering the facts in a light most favorable to the non-moving party, accepts as true that Summers complained to the doctor about his chest pains and throbbing chest. Baptist even concedes this point. The majority assumes, however,

-15-

that the physician:

> through inadvertence or inattention, did not perceive Summers to have cracking or popping noises in his chest, or pain in the front of his chest. This is why no chest x-rays were taken. In the medical judgment of the physician, Summers did not need a chest x-ray. Summers did receive substantial medical treatment.

Maj. Op., supra at 11.

With these few assumptions, the majority effectively usurps the role of the jury and makes the factual findings necessary to dismiss Summers' claim as one of mere negligence. It was for the jury, not the district court or this court, to determine the relative credibility of the parties and what occurred in the emergency room that day. We should not assume that the doctor did not hear Summers or forgot about his complaints. Nor should we assume that it was the physician's medical judgment that prompted his failure to give Summers a chest x-ray. It is possible that the doctor heard Summers' complaints and, for no legitimate reason, failed to do anything about them. That alternative would establish the essentials of an EMTALA cause of action.

As the majority recognizes, Summers' claim is factually similar to the plaintiff's claim in Power v. Arlington Hosp. Ass'n, 42 F.3d 851 (4th Cir. 1994),[1] in which the Fourth Circuit affirmed a jury's award of damages under EMTALA.[2] In Power, the plaintiff

---

[1]The only notable factual difference is that Power involved a patient who most likely was unable to pay for her care. She was unemployed and had no health insurance. 42 F.3d at 854. Like most circuits, however, the Power court explicitly held that an EMTALA plaintiff need not offer proof of an improper motive on the part of the hospital. Id. at 859.

[2]The majority "observes" that Power supports Summers' position, Maj. Op., supra at 12 n.4, but not surprisingly finds the Fourth Circuit's later opinion more persuasive. See Vickers v. Nash General Hospital, Inc., 78 F.3d 139 (4th Cir. 1996). In Vickers,
the Fourth Circuit does not discuss Power and relies heavily on the

-16-

was examined in the emergency room by two nurses and a doctor and was given various tests.  Id. at 854.  At trial, the doctor testified unequivocally that he treated Power as he would have treated any other patient with the same complaints and vital signs.  Id. at 855.  There was also testimony, however, that the doctor did not follow the usual hospital procedures in attending to Power.  Id.  Specifically, there was testimony that a blood test was a necessary component of an appropriate medical screening examination for a patient who presented at the emergency room with Power's symptoms.  Id.  The Fourth Circuit determined that Power presented evidence from which a jury could conclude she was treated differently from other patients and that the hospital did not apply its standard screening procedures uniformly.  Id. at 856.  Similarly, Summers presented sufficient evidence of an EMTALA violation for the district court to permit his claim to go to the jury.

II.

The majority's inappropriate resolution of this appeal from a grant of summary judgment is driven by its fear of giving EMTALA too "expansive" an interpretation such that it would apply in situations traditionally covered only by state malpractice law.  Not only is this fear unwarranted, it cannot justify significantly altering the plain language of the statute.

The statute clearly states that an individual has a cause of action against a hospital whenever the hospital's emergency room personnel fails to provide an appropriate medical screening examination and the individual is harmed as a direct result of that failure.  42 U.S.C. §§ 1395dd(a), (d)(2)(A).  The personal harm

---

dissenting opinion from our original panel decision.  Id. at 143-144.

provision of the statute does not require a plaintiff to prove the hospital's intent in violating a statutory requirement, but rather permits recovery for <u>all</u> violations, regardless of the hospital's motivation. In contrast, the statute provides for a civil money penalty against a hospital for a <u>negligent</u> violation of a statutory requirement. § 1395dd(d)(1)(A). This distinction--the explicit negligence requirement for a civil penalty--reinforces the plain statutory language of the personal harm provision. An EMTALA plaintiff need not demonstrate any level of intent on the part of the hospital, but only that the hospital failed to give him an appropriate screening examination.[3]

The majority gives lip service to following the literal language of the statute by not requiring proof of bias on the part of the hospital. Yet its strained definition of "appropriate," (i.e., "uniform" or that which would be given to a similarly situated patient) effectively limits the statute's application to only those cases that involve bias or discrimination. I see no way for a plaintiff to prove non-uniform or disparate treatment without evidence of the hospital's bias against a particular group to which he belongs. In this respect, our court is following the lead of almost every circuit that has examined this issue. While the Sixth Circuit is the only circuit that admits to requiring bias evidence

---

[3]The statute is not to be read so strictly as to preclude a medical judgment defense on the part of the hospital, however. The Fourth Circuit in <u>Power</u>, 42 F.3d at 858, recognized that the application of a screening procedure necessarily requires the exercise of medical training and judgment. The court set out a framework for EMTALA litigation to address those considerations. <u>Id.</u> at 858. Once a plaintiff makes a threshold showing of differential treatment, the hospital may offer rebuttal evidence by demonstrating either that the patient was accorded the same level of treatment that all other patients receive, or that a test or procedure was not given because the physician did not believe that the test was reasonable or necessary under the particular circumstances. <u>Id</u>. The plaintiff then has the opportunity to challenge the physicians' medical judgment through her own expert testimony. <u>Id.</u>

for an EMTALA violation, see Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 272 (6th Cir. 1990), the only circuit court decisions that permit an EMTALA claim to go forward involve evidence of bias. See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (affirming jury verdict for plaintiff where "datum suggesting [hospital] tried to shunt [patient] as soon as it scrutinized her insurance card"), cert. denied sub nom. Hosp. San Francisco, Inc. v. Gonzalez, 116 S. Ct. 1423 (1996); Power, 42 F.3d at 854 (affirming jury verdict for unemployed and uninsured plaintiff).

In light of Congress' intent to address patient "dumping" in enacting EMTALA, the majority is understandably frustrated by the plain language of the statute. Its limitation of the statute's application perhaps even meets Congress' objective better than the law enacted by Congress. It is not our role, however, to re-draft the statute and to alter its plain language. See Vickers v. Nash General Hosp., Inc., 78 F.3d 139, 146 (4th Cir. 1996) (Ervin, J., dissenting) ("Regardless of what we divine the congressional intent to have been, the statute is perfectly clear about what a plaintiff must allege in order to state a claim.").

Under the statute as written, credible allegations that a hospital has failed to follow its own established screening procedures in the treatment of a particular patient constitute a threshold showing of an EMTALA violation. Summers has made adequate allegations to survive summary judgment. Whether the doctor acted within the parameters of a hospital's loose, unwritten screening procedures is a factual question to be determined by the jury. I refuse to assume facts against Summers' position in an effort to limit EMTALA claims generally. Thus, I adhere to my original position and would reverse the district court's grant of summary judgment in this case.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.