**Robert Dean CASEY and Judy Carol Phelps, (f/k/a Judy Carol Wilson), Appellants,**

v.

**AMARILLO HOSPITAL DISTRICT, Appellee.**

No. 07–96–0037–CV.

Court of Appeals of Texas, Amarillo.

June 5, 1997.

Rehearing Overruled July 14, 1997.

Templeton, Smithee, Hayes & Fields, Joe W. Hayes, Amarillo, for appellants.

Gibson, Ochsner & Adkins, L.L.P., Thomas C. Riney, Tod Mayfield, Amarillo, for appellee.

Before DODSON and QUINN, JJ., and REYNOLDS, Senior Justice.*

DODSON, Justice.

Robert Dean Casey and Judy Carol Phelps (the Parents), as parents of Justin Dean Casey, deceased, (Justin), appeal from the trial court's summary judgment rendered in favor of the Amarillo Hospital District (the Hospital) and challenges that portion of the judgment which disposed of their claim under the federal Emergency Medical Treatment and Active Labor Act (EMTALA), codified at 42 U.S.C. § 1395dd. By their sole point of error, the Parents contend that the trial court erred in granting the Hospital's motion which asserted that the Hospital's treatment of Justin was within the acceptable parameters of EMTALA. Concluding that the summary judgment evidence conclusively negated essential elements of the Parents' EMTALA claim, we affirm.

The record shows the following facts. On May 2, 1991, at 6:30 p.m., the Hospital admitted Justin to the emergency room with a fever of 106.5 degrees. Dr. R.D. Hubbird, who was Justin's pediatrician, then examined Justin. Dr. Hubbird ordered that lab tests be performed and a chest x-ray be taken. These were taken and performed by Hospital personnel. By 8:30 p.m., Justin's temperature dropped to 103.2 degrees. At this point, Dr. Hubbird consulted with Dr. Steve O'Grady, who was a pediatric intern at the Hospital. Dr. Hubbird concluded that Justin suffered from constipation and recommended that Justin be taken home. On May 3, 1991, at approximately 4:45 a.m., Justin started convulsing and stopped breathing. An ambulance took Justin back to the Hospital, where he died at approximately 6:15 a.m. The cause of Justin's death was determined to be meningococcemia.

* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex.

By one point of error, the Parents claim that the trial court erred in rendering summary judgment as to their EMTALA claim because: 1) genuine issues of material fact exist as to whether the Hospital provided an appropriate medical screening examination and whether the Hospital actually knew of an emergency medical condition, and 2) the EMTALA does not require that a motive on the part of the Hospital be plead or proved.

When a defendant moves for summary judgment, that party must conclusively negate at least one essential element of each cause of action brought by the plaintiff. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). The question on appeal, as well as in the trial court, is *not* whether the summary judgment proof *raises fact issues* with reference to the essential elements of a plaintiff's claim. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970). Rather, when reviewing the summary judgment record, we apply the following standards:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985).

When a summary judgment order does not specify the basis upon which it is granted, the summary judgment will be upheld on any theories asserted by the movant that are supported by the evidence. *Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 79 (Tex.1989). Evidence favoring the movant's position will not be considered on review of a summary judgment unless it is uncontradicted. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.,* 391 S.W.2d 41, 47

Gov't Ann. § 75.002(a)(1) (Vernon Supp. 1997).

(Tex.1965). Finally, where a movant's evidence is uncontradicted, it will be taken as true. *Railroad Commission v. Sample*, 405 S.W.2d 338 (Tex.1966).

■ Before we consider the Parents' point of error and its sub-points, it is necessary to discuss the EMTALA and the relevant case law interpreting the EMTALA. The EMTALA was enacted by Congress to address a growing concern that hospitals were either "dumping" patients who could not pay or transferring patients to another hospital before their emergency conditions were stabilized. *Miller v. Medical Ctr. of Southwest La.*, 22 F.3d 626, 628 (5th Cir. 1994). The EMTALA was not intended to duplicate or preempt state law protections that already existed, but was intended to create a new cause of action not available under state law for "failure to treat." *Summers v. Baptist Medical Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir.1996).

■ There are two requirements placed upon hospitals by the EMTALA. First, "the Hospital must provide for an appropriate medical screening examination ... to determine whether or not an emergency medical condition exists." 42 U.S.C. § 1395dd(a). Second, if the hospital determines that an emergency medical condition exists, the hospital must either stabilize the medical condition, or transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b). A cause of action under the EMTALA, then, may be established in one of two ways. First, the claimant may establish that the hospital did not meet these requirements because the hospital's screening examination was not appropriate. Second, the claimant may establish that the hospital determined that an emergency medical condition existed and failed to stabilize the condition or transfer the patient to another hospital.

■ In general, it is established that an EMTALA violation is vastly different from medical negligence, and the appropriateness of a screening examination is not to be judged against a negligence standard. *Summers v. Baptist Medical Ctr. Arkadelphia*, 91 F.3d at 1137; *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992).

"EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Power v. Arlington Hosp. Ass'n.*, 42 F.3d 851, 856 (4th Cir.1994).

■ The EMTALA requirement that the screening examination be "appropriate" requires that hospitals determine what their screening procedures will be, and then apply them uniformly to all individuals who come into the emergency room. *Summers v. Baptist Medical Ctr. Arkadelphia*, 91 F.3d at 1138. The EMTALA was not created "to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991). In that connection, for the claimant to establish that the hospital's screening procedures are not appropriate, the claimant must establish that he did not receive the same screening examination as every other person who enters the emergency room with the same or similar condition.

■ If the claimant fails to establish that the screening examination is not appropriate, a cause of action may still lie under the EMTALA upon a showing that the hospital, after determining that an emergency medical condition existed, failed to either stabilize the medical condition or transfer the patient to another medical facility. 42 U.S.C. § 1395dd(b). To satisfy this second requirement, a claimant must show that the emergency medical condition was "within the actual knowledge of the doctors on duty." *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 269 (6th Cir.1990). Therefore, the hospital's actions are to be viewed in terms of the actual diagnosis, not in terms of what the diagnosis should have been. *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139, 145 (4th Cir.1996). Accordingly, in order for a hospital to be liable for failing to stabilize or transfer a patient, it must be shown that an emergency condition existed and that the hospital, through the doctors on duty, had actual knowledge of the emergency

condition. *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d at 269.

Some courts have required claimants to satisfy a second element, in addition to one of the two discussed above, in order to state any EMTALA cause of action. These courts have required that the claimant show an improper motive for "dumping" the claimant on the part of the hospital. *See, Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d at 266. As stated above, the legislative history of the EMTALA shows that Congress passed it in order to protect indigent and uninsured patients from being "dumped" by hospitals who did not want to treat them. *Summers v. Baptist Medical Ctr. Arkadelphia,* 91 F.3d at 1136.

The express language of the statute, however, provides in clear and unambiguous language that "any individual" coming to an emergency room must be afforded an appropriate medical screening examination. 42 U.S.C. § 1395dd(a). This express statutory language has lead every Federal Circuit Court of Appeals who has considered this issue, save the Sixth Circuit in *Cleland,* to conclude that no improper motive for disparate treatment need be shown on the part of the hospital in order to state a cause of action under the EMTALA. *See, Burditt v. U.S. Dept. of Health and Human Servs.,* 934 F.2d 1362, 1363 (5th Cir.1991); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d at 1041; *Power v. Arlington Hosp. Ass'n.,* 42 F.3d at 851; *Summers v. Baptist Medical Ctr. Arkadelphia,* 91 F.3d at 1132.

■ We conclude, as have the Fourth, Fifth, Eighth, and D.C. Circuit Courts of Appeal, that "we are bound by statutory language this clear, at least where, as here, it is not manifestly inconsistent with legislative intent." *Gatewood v. Washington Healthcare Corp.,* 933 F.2d at 1040. Therefore, under the express language of the statute, an EMTALA claim may be raised by any individual who has received disparate treatment, regardless of whether an improper motive has been shown on the part of the hospital.

■ In the first sub-point of their sole point of error, the Parents assert that the trial court erred in rendering summary judg-

ment on behalf of the Hospital because genuine issues of material fact exist as to whether the Hospital provided an appropriate medical screening examination. The Hospital presented evidence of its triage policy as proof of its screening procedure in support of its motion for summary judgment. As part of that procedure, the Hospital's policy states that:

4. Vital signs should be taken on all urgent patients at time of triage (non urgent patients may be asked to wait in the lobby until the triage nurse is available to take vital signs).

The Parents contend that Justin's examination under this procedure was not appropriate on May 2, 1991, because Justin's complete vital signs were not taken. To support their contention that the Hospital's procedures were not appropriate, the Parents direct us to the affidavit of their expert, Dr. Alan C. Taylor. In his affidavit, Dr. Taylor states that "[n]either the triage nurse nor Dr. Hubbird took the complete vital signs of Justin Dean Casey, which would include his blood pressure." Dr. Taylor goes on to state that his opinion is based upon "[t]he medical standard of care applicable to the triage nurse, as well as Dr. Hubbird . . . ."

Dr. Taylor's testimony attempts to show that the Hospital was negligent under a general medical standard of care in not taking Justin's blood pressure. However, Dr. Taylor's testimony does not attempt to show or even allege that Justin received less of a screening examination than any other person in his condition receives under the Hospital's stated procedures. As stated above, the appropriateness of a Hospital's screening procedures is viewed in terms of disparate treatment, not in terms of the medical quality of the procedures. *Vickers v. Nash General Hospital, Inc.,* 78 F.3d at 143.

In support of their motion for summary judgment, the Hospital presented as evidence the affidavit of Jean Whitehead, who is the Trauma Coordinator for the Hospital. In that affidavit, Whitehead states that:

. . . all standards, practices, policies, and procedures were appropriately and accurately followed. Justin Casey received the same initial screening examination as any

other patient would who presented with the same complaints and symptoms as those for which Decedent complained.

As further stated in her affidavit, Whitehead's opinion is based on a review of the "triage notes pertaining to Justin Casey . . . and the Northwest Texas Healthcare System Patient Care Services Structure Standards . . . ." Finally, she states that, " . . . it appears that all standards, practices, policies and procedures were appropriately and accurately followed."

Whitehead's affidavit is uncontradicted by the affidavit of Dr. Taylor, insofar as Dr. Taylor's testimony addresses the Hospital's alleged negligence but not the appropriateness of the Hospital's procedures under the EMTALA. Whitehead's affidavit shows that the Hospital's screening procedures were appropriate, and is therefore sufficient to support a summary judgment. It is the sworn testimony of a witness with personal knowledge of standard practices at this Hospital who states that she reviewed the relevant evidence which shows that Justin was treated in the same manner as anyone with his condition would have been at this Hospital. Therefore, the trial court did not err in rendering summary judgment on the question of whether the Hospital provided an appropriate screening examination.

 In the second sub-point of their sole point of error, the Parents assert that the trial court erred in rendering summary judgment on behalf of the Hospital because genuine issues of material fact exist as to whether the Hospital actually knew of an emergency medical condition. The Parents point to three pieces of evidence to support their contention. First, the Parents contend that the evidence presented in the affidavit of Dr. Taylor shows that there is a genuine issue of material fact as to whether the Hospital had actual knowledge of an emergency condition. In his affidavit, Dr. Taylor states that:

> In my opinion, the symptoms displayed by Justin Dean Casey after his admission to the Northwest Texas Hospital emergency room and his examination by Dr. Hubbird, definitely indicated that an emergency medical condition existed. . . . The presence of either anion gap acidosis, and/or

sepsis constitutes an emergency medical condition. The fact that Dr. Hubbird ordered a C–Reactive Protein test indicates to me that [Dr. Casey] [sic] was suspicious that an emergency medical condition existed.

This evidence shows that Justin's symptoms, as discovered by Dr. Hubbird, constituted an emergency medical condition *in Dr. Taylor's opinion.* In other words, in Dr. Taylor's opinion, Dr. Hubbird should have perceived and diagnosed an emergency medical condition. This evidence also shows that, based on a suspicion that an emergency condition existed, Dr. Hubbird ordered a C–Reactive Protein test. But the evidence does not show that, based on Justin's symptoms or the results of the C–Reactive Protein test, Dr. Hubbird had actual knowledge of or formed an opinion that an emergency condition existed. The requirement of the EMTALA is that the Hospital have actual knowledge of an emergency condition, not that the Hospital negligently fail to diagnose a condition as being an emergency condition. *Summers v. Baptist Medical Ctr. Arkadelphia,* 91 F.3d at 1139; *Vickers v. Nash General Hospital, Inc.,* 78 F.3d at 145.

Dr. Hubbird, by affidavit and in his deposition, testified that, after performing the appropriate examination and running several laboratory tests, at no time did he consider Justin's symptoms to constitute an emergency medical condition. His testimony is not contradicted by the Parents' summary judgment evidence, in that Dr. Taylor's affidavit states what Dr. Hubbird should have known, not what Dr. Hubbird actually knew. Dr. Hubbird's testimony, taken as true, is sufficient to support the summary judgment of the trial court.

Second, the Parents contend that the deposition testimony of Dr. Steve O'Grady, the intern who assisted Dr. Hubbird, is evidence that a genuine issue of material fact exists as to whether Dr. Hubbird, and therefore the Hospital, had actual knowledge of an emergency situation. Dr. O'Grady testified that after consulting with Dr. Hubbird, he asked Dr. Hubbird if Justin had any signs of meningitis, and Dr. Hubbird told him that the tests revealed no signs of meningitis. Dr.

O'Grady further testified that he asked this question because a child presented with a fever as high as Justin's raised a suspicion of meningitis in his mind.

Dr. O'Grady's testimony at most shows a mere suspicion on the part of Dr. O'Grady and that, based on Dr. O'Grady's suspicion, Dr. Hubbird should have detected meningitis. This evidence does not show that Dr. O'Grady or Dr. Hubbird actually knew that Justin suffered from an emergency condition on May 2, 1991, and therefore does not contradict the testimony of Dr. Hubbird that he perceived no emergency condition. A showing of the Hospital's suspicions does not rise to the level of actual knowledge.

Finally, the Parents contend that the strongest evidence showing that the Hospital actually perceived an emergency condition is a "Code 99" notation on Justin's May 2, 1991 treatment record. The Parents also point to the deposition of Dr. O'Grady, wherein he testified that a "Code 99" was, "the code for an emergency situation that they used at Northwest Texas Hospital." Dr. O'Grady further testified in his deposition that a "Code 99" would not have applied to Justin on May 2, 1991. Dr. Hubbird also testified that a "Code 99" situation did not exist as to Justin on May 2, 1991.

An emergency medical condition is one "within the actual knowledge of *the doctors on duty...*" *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d at 269 (emphasis added). The deposition testimony of Dr. Hubbird and Dr. O'Grady shows that neither one of the doctors entered the "Code 99" notation on Justin's May 2, 1991 treatment record. Indeed, both doctors testified that they did not consider Justin's condition to constitute an emergency on May 2, 1991. The Parents offer no evidence of who the person was that made the "Code 99" notation on the May 2, 1991 treatment record. The deposition testimony of the two doctors in this regard is uncontradicted, and, taken as true, is sufficient to support the trial court's summary judgment. Accordingly, no genuine issue of material fact exists as to whether the Hospital had actual knowledge that an emergency condition existed as to Justin on May 2, 1991.

In the third and final sub-point of their sole point of error, the Parents assert that, in order to have a cause of action under the EMTALA, they need not prove that the Hospital had an economic motive in violating the EMTALA. The Hospital, as grounds for summary judgment, claimed in its motion that because no allegation of economic motive had been alleged, the Parents had no cause of action under the EMTALA. As discussed above, we conclude that the express statutory language must be followed, especially where, as here, it is not "manifestly inconsistent with legislative intent." *Gatewood v. Washington Healthcare Corp.*, 933 F.2d at 1041. Accordingly, no economic or other improper motive need be shown on the part of the Hospital in order for the Parents to state a cause of action under the EMTALA. Therefore, since motive is not a material or essential element of the Parents' cause of action under the EMTALA, no reversible error is presented by the Parents' third sub-point of error.

Accordingly, the Parents' first and second sub-points of error are overruled and the trial court's summary judgment rendered in favor of the Hospital is affirmed.