# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-1572

_____

Kimberly Ruloph

*Plaintiff - Appellant*

v.

LAMMICO, doing business as LAMMICO Risk Retention Group, Inc.

*Defendant - Appellee*

Washington Regional Medical Center

*Defendant*

Mercy Hospital-Fort Smith

*Defendant - Appellee*

Jody A. Bradshaw; Kristin Pece, M.D.

*Defendant*s

Mercy Clinics Fort Smith Communities; Robert A. Irwin, M.D.

*Defendants - Appellees*

John Does, 2-10, also known as John Does 1-10

*Defendant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Ft. Smith

_____

Submitted: February 17, 2022
Filed: October 7, 2022

_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

Kimberly Ruloph brought suit against LAMMICO d/b/a Lammico Risk Retension Group, Inc. (LAMMICO); Mercy Hospital-Fort Smith (Mercy); Jody A. Bradshaw, M.D.; Kristen Pece, M.D.; Mercy Clinic Fort Smith Communities; Robert A. Irwin, M.D.; and John Does 1-10, alleging liability under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. She now appeals the district court[1] grant of summary judgment to the defendants. We affirm.

I. *Background*

Ruloph alleges that Mercy violated the EMTALA in its handling of her transfer from Mercy to Washington Regional Medical Center (WRMC) on April 15, 2018. Shortly after noon that day, Ruloph arrived at Mercy's emergency department having injured her knee in a fall. Dr. Kristin Pece diagnosed the condition and noted that Ruloph's blood flow was obstructed to her foot, which showed no pulse. Dr. Jody

_____

[1]The Honorable P.K. Holmes, III., United States District Judge for the Western District of Arkansas.

Bradshaw reduced[2] Ruloph's dislocated knee. Doppler studies, a way to evaluate the body's circulatory system, confirmed the lack of blood flow in her lower left leg.

Dr. Bradshaw concluded that Ruloph had suffered a vascular injury based on the Doppler test results and missing pulse. He further concluded that Mercy was incapable of providing Ruloph proper treatment for her injury and that she needed to be transferred to a facility with a qualified vascular surgeon. The condition constituted a medical emergency under EMTALA. Mercy then called the Arkansas Trauma Communications Center (ATCC), "an arm of the Arkansas Department of Health (ADH), of which Mercy is a member," and notified it of Ruloph's injury and the situation necessitating a transfer. R. Doc. 84, at 8. ATCC facilitated a call with Washington Regional Medical Center (WRMC) located in Fayetteville, Arkansas, as that facility was available for a possible transfer. Around 1:20 p.m., Dr. Bradshaw connected with Dr. Robert Irwin in Fayetteville. Dr. Irwin, on behalf of WRMC, accepted Ruloph as a patient after receiving Ruloph's medical condition information from Mercy. Dr. Pece placed the transfer order at 1:37 p.m., stating, "External Transfer To [W]ash [R]egional for va[s]cular surgery via trauma com arrangemen[t]s." R. Doc. 92-8, at 1.

Dr. Pece also noted in the Acute Care Transfer Note that WRMC "has available space and qualified personnel for the treatment of the patient" and that transfer benefits included "[a]vailability of specialty care," specifically, "va[s]cular surgery." R. Doc. 92-9, at 2. At 2:05 p.m., Ruloph's spouse, Gary Ruloph, signed a consent form for Ruloph's transfer to WRMC for vascular surgery. Dr. Irwin was updated on

_____

[2]"[R]eduction" is "the replacement or realignment of a body part in normal position or restoration of a bodily condition to normal." *Reduction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/reduction#medicalDictionary (last visited Aug. 19, 2022).

Ruloph's condition when he received a call from Dr. Pece around 2:44 p.m. During the call, Dr. Irwin reaffirmed that WRMC would be able to treat Ruloph, stating, "[G]o ahead and send her." R. Doc. 92-6, at 2.

At 2:55 p.m., Ruloph left Mercy by ambulance for Fayetteville. Unfortunately, after Ruloph's departure from Mercy to WRMC, WRMC realized its facility did not have an available vascular surgeon to treat Ruloph's condition. Ruloph arrived safely at WRMC. After receiving Ruloph into its emergency room, WRMC immediately made arrangements for Ruloph to be transferred to Mercy Hospital-Springfield in Springfield, Missouri. Ruloph arrived at Mercy Hospital-Springfield by helicopter, and a peripheral vascular surgeon operated. Unfortunately, the surgery occurred too late to save Ruloph's leg.

Ruloph filed suit against the hospitals and physicians involved along with their insurers under the EMTALA. Ruloph claimed that Mercy made an "inappropriate transfer," in violation of 42 U.S.C. § 1395dd(b). R. Doc. 84, at 11. Ruloph alleges that the delay in receiving vascular surgery within a six-hour window after the injury caused her leg to be amputated. Ruloph further alleged that "Mercy's statutory duty under EMTALA, and its liability for damages caused by a violation of EMTALA, is strict or absolute." *Id.* at 15.

Mercy[3] moved for summary judgment against Ruloph's strict liability claim. In its order granting Mercy's motion, the district court reviewed the history of EMTALA. The court noted that "[t]he purpose of EMTALA is to address the problem of patient dumping, where hospitals refuse to treat patients in an emergency room if the patients do not have health insurance." *Ruloph v. LAMMICO*, No. 2:20-cv-02053-PKH, 2021 WL 517044, at *2 (W.D. Ark. Feb. 11, 2021). The statute requires hospitals to evaluate the medical condition of patients entering emergency rooms and provide appropriate treatment to stabilize their medical condition and transfer them only if an emergency condition supports transfer to another hospital with required facilities and qualified personnel. 42 U.S.C. § 1395dd(b). The court identified the sole issue as whether "Mercy effected an appropriate transfer of Ms. Ruloph under EMTALA when WRMC represented it had qualified personnel and accepted the transfer, leaving Mercy to learn when Ms. Ruloph was already in transit to WRMC that WRMC did not in fact have qualified personnel to treat Ms. Ruloph." *Id.* at *3. The district court dismissed Ruloph's claims against the defendants after concluding that claims seeking relief for "EMTALA transfer violations must be predicated on a hospital's actual knowledge." *Id.* at *4.

---

[3]The district court granted Ruloph's motion to dismiss Dr. Pece, Dr. Bradshaw, and Mercy Clinics Fort Smith Community without prejudice on November 24, 2020. Ruloph filed motions to dismiss defendants John Does 1-10 on December 8, 2020 but the district court did not make a specific ruling as to those two motions before the judgment for which this appeal stems from. Subsequently, Ruloph filed an amended third complaint on December 29, 2020 including the aforementioned defendants as well as LAMMICO, Dr. Irwin, and Mercy-Fort Smith but not the John Does. Although Mercy moved for summary judgment against Ruloph, the other defendants did not make a formal motion before the district court ruled on Mercy and Ruloph's motions. The EMTALA claim against Mercy was dismissed with prejudice, while the claims against all other defendants were summarily dismissed without prejudice on February 11, 2021. This appeal followed.

## II. *Discussion*

On appeal, Ruloph argues that the district court erred in granting summary judgment to the defendants. "We review de novo a district court's grant of summary judgment." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 756 (8th Cir. 2001)). Only in instances where the "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law" do we find summary judgment to be proper. *Id*.

On appeal, Ruloph argues that EMTALA imposes a strict liability standard for noncompliance with its directions. Ruloph relies on *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996) (en banc), and *Abercrombie v. Osteopathic Hospital Founders Ass'n*, 950 F.2d 676 (10th Cir. 1991), to support the contention that EMTALA imposes a strict liability standard. That reliance is misplaced.

Mercy urges us to reject Ruloph's argument because it "finds no support in the text of the [A]ct or in this [c]ourt's interpretation of the [A]ct." Mercy's Br. at 10. Ruloph concedes that *Summers* concerned "compliance with the screening requirement under EMTALA," not the duty to provide an appropriate transfer. Appellant's Br. at 16. *Summers* concerns 1395dd(a)'s screening process for patients, not a health care facility's transfer of patients under 1395dd(b)(1):

> [W]e h[e]ld that instances of "dumping," or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA. But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not.

91 F.3d at 1139.

Ruloph's proposed reading of EMTALA would extend the duty to provide for an appropriate transfer to include responsibility for the accuracy of the representations of expertise made by the receiving hospital. We conclude that EMTALA does not go that far. The statute delineates the mandatory duties of a subject hospital. It provides:

(1) In general

If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital *must* provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1) (emphasis added).

Section 1395dd(c), "Restricting transfers until individual stabilized," defines an appropriate transfer. Such a transfer occurs when a "transferring hospital provides the medical treatment within its capacity" and "the receiving facility . . . (i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment." 42 U.S.C. § 1395dd(c)(2).

We interpret "a statute according to its plain meaning unless context requires otherwise." *In re Cotter Corp., (N.S.L.)*, 22 F.4th 788, 795 (8th Cir. 2022). Here, the requirement in subsection (c) that the "receiving facility" have "qualified personnel for the treatment" would appear to impose strict liability under its plain meaning.

However, context requires a different interpretation because this reading would lead to results wholly at odds with the statute's purpose. EMTALA sought to (1) prevent "the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them," *Summers*, 91 F.3d at 1136, and (2) "create a new cause of action . . . for what amounts to failure to treat," *id.* at 1137 (internal quotation marks omitted).

EMTALA's aim is to discourage bad-faith hospitals from dumping patients. Imposing liability upon a hospital's good-faith effort to secure appropriate care for a patient that is beyond its capabilities is off the mark. Such liability would run contrary to EMTALA's purpose and would undermine the express target of securing adequate care for patients who could not otherwise afford it.

For example, if a hospital takes a patient, provides all the care within its capabilities, discovers it cannot render further adequate care with its personnel, confirms that a receiving hospital has the specialized doctor who can provide the necessary treatment, and then transfers the patient, its EMTALA's duties should, at that point, be fulfilled. If, for reasons beyond its control, the specialist becomes unavailable after the first hospital transferred the patient, holding the transferring hospital liable under EMTALA unreasonably extends the statute's reach. In such a case, despite the hospital's best efforts, the patient now would be heading to a receiving hospital without the "qualified personnel." We conclude that the statute does not impose this type of strict liability.

Here, Mercy's doctor explained to WRMC's doctor that Ruloph dislocated her knee, but had a pulseless foot even after her knee was reduced, and that Mercy did not "have a vascular surgeon capable of repairing" the injury. R. Doc. 92-4, at 6. She stated that Mercy did not yet have more detailed imaging, but WRMC nonetheless accepted Ruloph, stating, "[S]end her imaging with you [sic] . . . , but that's fine . . . we'll take her." *Id.* at 7 (second ellipsis in original). WRMC never suggested that

its personnel would not be qualified to handle her injury, or that its assessment could change depending on her imaging and the complexity of the injury. Mercy then conducted the transfer, sending Ruloph in an ambulance to WRMC. It was not until two hours later—while Ruloph was en route—that WRMC's surgeon reviewed the imaging and concluded that the necessary treatment "was way more complicated and in depth than [WRMC would] be able to do." *Id.* at 9.

When Mercy sent Ruloph to WRMC, it acted in good faith, under the reasonable impression—caused by WRMC—that WRMC had adequate, "qualified personnel for the treatment of" Ruloph. *See* 42 U.S.C § 13955dd(c)(2)(B)(i). Mercy did not attempt to dump Ruloph; it fulfilled its EMTALA obligations. Mercy's reliance on WRMC's errant assessment of its own capabilities does not violate EMTALA.

Further, EMTALA does not define the time at which the "appropriate transfer" should be measured: whether at the moment the first hospital effects the transfer, when the patient arrives at the receiving hospital, or at some other time. In light of EMTALA's purpose of discouraging bad actors from "dumping" patients, EMTALA implies that the "appropriate transfer" inquiry should focus on the knowledge of the transferring hospital at the time that it effects the transfer—the moment when the two hospitals have agreed to the transfer and the patient departs for the receiving hospital. Measuring knowledge at a different time—as Ruloph proposes—may produce absurd outcomes in which a good-faith transferring hospital is held liable for relying on information exclusively in control of the recipient hospital.

Thus, EMTALA's "appropriate transfer" requirement should be assessed from the perspective of a reasonable transferring hospital at the time the hospitals agreed to the transfer and the patient departed the transferring hospital. *Cf. Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1372 (5th Cir. 1991) (interpreting "'as required' in 42 U.S.C. § 1395dd(c)(2)(C) to limit the scope of the requirement of

qualified personnel and equipment to those conditions known to the transferring physician" and applying a "reasonable physician" standard).

Under this standard, Mercy effected an "appropriate transfer": it sent Ruloph to a hospital that, based on the information conveyed to it by the hospital, had "qualified personnel" for her treatment. There is no genuine issue of material fact about the information that Mercy had at that moment or whether its reliance on that information was reasonable. Thus, the district court properly concluded that Mercy could not be held liable for violating § 1395dd(b) based on subsection (c)'s "qualified personnel" requirement.

The district court applied EMTALA to the facts in this case and concluded that Mercy's obligations were not in the nature of a strict liability duty and that Mercy acted reasonably given the knowledge that it had at the time that it made the transfer to WRMC. With no genuine factual dispute present, we hold that the district court properly granted summary judgment.

III. *Conclusion*

Accordingly, we affirm the district court.

_____