OPINION OF THE COURT
Lewis R. Friedman, J.
In 1986 Congress adopted the Emergency Medical Treatment and Active Labor Act (EMTALA) (42 USC § 1395dd)[1] which sets a Federal standard for certain aspects of emergency room treatment. This summary judgment motion by plaintiff and defendants’ cross motion to dismiss claims under *363 42 USC § 1395dd call for the court to determine whether the EMTALA provides a new cause of action to be invoked in State court for improper emergency room treatment and the scope of that cause of action. Although there are cases in the Federal courts and in other States, there are almost no reported New York cases.
For the purposes of this motion the facts are not in dispute. About 5:30 p.m. on November 26, 1988 Antoinette Carodenuto was mugged, bruising her head. The police responded and arranged for an ambulance to North Central Bronx Hospital; Ms. Carodenuto complained of headaches but denied losing consciousness. She arrived in the emergency room before 6:00 p.m. where the triage nurse found her "oriented as to person, place and time”, checked her vital signs and obtained a medical history. Ms. Carodenuto was registered at the surgical critical care unit. A physician performed a physical examination and a neurological evaluation; the physical findings were "unremarkable”. The physician diagnosed her condition as "post concussive syndrome”, gave her Tylenol for pain and provided written instructions about head injuries. Ms. Carodenuto was discharged at 6:45 p.m. with instructions to follow up with her family physician. Ms. Carodenuto returned to the emergency room after 10:30 p.m. that night complaining of dizziness, chills and nausea, including vomiting. Her vital signs were stable. She claimed that she had lost consciousness and had injured the back of her head when she hit the floor at home. Tests and X-rays were done after 11:30 p.m.; ultimately she fell into a coma and was transferred to Jacobi Hospital for neurosurgery. She remained hospitalized for many months and is now severely brain damaged.
Ms. Carodenuto filed a notice of claim in January 1989 alleging that North Central Bronx Hospital: "discharged [her] without proper evaluation or x-rays”. She also claimed that she had been "left to languish” for more than three hours. The original complaint alleged medical malpractice in various respects — inadequate treatment and delay. Plaintiff’s amended complaint added a new theory: liability for failure to provide a medical screening exam to determine if she had a medical condition and for failure to stabilize her prior to her original discharge (42 USC § 1395dd). Plaintiff argues, in essence, that the Federal statute creates absolute liability, or negligence per se for failure to "stabilize” a patient prior to discharge or transfer.
The EMTALA was passed by Congress in 1986 to address the problem created when hospitals refused to treat, and *364 "dumped” into the streets, emergency room patients who were unprofitable, uninsured and poor (see, HR Rep No. 241, 99th Cong, 2d Sess 27, reprinted in 1986 US Code Cong & Admin News 579, 605-606; Note, Preventing Patient Dumping: Sharpening Cobra’s Fangs, 61 NYU L Rev 1186, 1187-1188 [1986]; Cleland v Bronson Health Care Group, 917 F2d 266, 268 [6th Cir 1990]; Bryant v Riddle Mem. Hosp., 689 F Supp 490, 492 [ED Pa 1988]). The solution Congress adopted compels Medicare provider hospitals to provide treatment and stabilization for any patient who arrives at their emergency rooms. The hospital must "provide for an appropriate medical screening examination within the capability of the hospital’s emergency department to determine whether or not an emergency medical condition * * * exists” (42 USC § 1395dd [a]) and "[i]f a patient * * * has an emergency medical condition which has not been stabilized” the hospital may not transfer or discharge the patient unless specified criteria are met (42 USC § 1395dd [c] [1]). The statute provides for a civil penalty against a hospital of up to $50,000 for a knowing violation (42 USC § 1395dd [d] [2]) and that "[a]ny individual who suffers personal harm as a direct result of a participating hospital’s violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located” (42 USC § 1395dd [d] [3] [A]).[2]
In light of the indisputable legislative history, the threshold question is whether EMTALA permits a private right of action by a plaintiff who does not allege that he or she was denied treatment or stabilization for economic reasons. Federal courts have reached divergent results. Several courts concluded that the statute should be interpreted to give effect only to the expressed legislative intent — preventing "dumping” of patients unable to pay; those courts require allegations that the plaintiff is indigent and uninsured (see, e.g., Stewart v Myrick, 731 F Supp 433 [D Kan]; Evitt v University Hgts. Hosp., 727 F Supp 495 [SD Ind 1989]; Nicholas v Estabrook, 741 F Supp 325 [D NH 1989]; cf., Thompson v St. Anne’s Hosp., 716 F Supp 8, 10 [ND Ill 1989]). The Fourth Department, in dictum, suggests that EMTALA is limited to those cases where there are allegations of transfer "for economic *365 reasons” (DiGicomo v St. Joseph’s Hosp. & Health Ctr., 182 AD2d 1106, supra). However, that analysis ignores the statute’s unambiguous language which fails to impose any limitation on which plaintiffs may seek to invoke it: ”[a]ny individual who suffers personal harm” is entitled to recover. This court, without repeating here the extended analysis in the Federal cases, agrees with those Federal courts which have permitted an action in the absence of allegations of "patient dumping” (e.g., Cleland v Bronson Health Care Group, supra, at 270; Gatewood v Washington Healthcare Corp., 933 F2d 1037, 1040-1041 [DC Cir 1991]; Brooker v Desert Hosp. Corp., 947 F2d 412, 414 [9th Cir 1991]; Collins v DePaul Hosp., 963 F2d 303, 308 [10th Cir 1992]; DeBerry v Sherman Hosp. Assn., 741 F Supp 1302 [ND Ill 1990]). That is, clear statutory language should be applied as written unless "the literal words of the statute would bring about an end completely at variance with the purpose” of the statute (Aviation Consumer Action Project v Washburn, 535 F2d 101, 106-107 [DC Cir 1976]; see, United Mine Workers v Federal Mine Safety & Health Review Commn., 671 F2d 615, 621 [DC Cir 1982], cert denied 459 US 927; Wilderness Socy. v Morton, 479 F2d 842, 855 [DC Cir 1973] [en banc], cert denied 411 US 917). In this instance the legislative history merely fails to disclose a reason for the broad remedy provided in the final act, but the history is not inconsistent with a broad, inclusive remedy. The statute "may go further than what Congress contemplated, but that is not a reason to distort or excise the words that Congress wrote” (Cleland v Bronson Health Care Group, supra, 917 F2d, at 270). The court finds that the failure to allege "patient dumping” here is not fatal.
A similar straightforward reading of the statutory language precludes any cause of action against the individual defendants. While EMTALA provides for "civil penalties” against physicians under certain circumstances (42 USC § 1395dd [d] [1], [2] [C]), the private "civil enforcement” provisions (42 USC § 1395dd [d] [3] [A]) refer only to actions against a "participating hospital”. The omission of any reference to physicians in that section leads inexorably to the conclusion that Congress intentionally precluded actions against physicians (see, Verhagen v Olarte, 1989 WL 146265 [US Dist Ct, SD NY, Nov. 21, 1989, 89 Civ 0300]). As one Federal court noted "[i]f Congress had intended to create a private cause of action against the physician, it knew how to do so” (Delaney v Cade, 756 F Supp 1476, 1487 [D Kan 1991]). Thus, the Federal cause of action *366 against the individual defendants must be dismissed (see, Baber v Hospital Corp., 977 F2d 872 [4th Cir 1992]).
The court must determine the scope of cause of action created by the Federal statute.[3] Plaintiff appears to argue that the mere discharge from an emergency room of a patient who thereafter suffers a serious adverse result is sufficient to establish liability. Clearly the EMTALA cause of action is one of absolute liability. The definition of the cause of action does not use the term "negligence” (42 USC § 1395dd [d] [3] [A]). Courts have generally interpreted that omission as intentional, reflecting congressional intent to impose "strict liability” on a hospital for failure to comply with EMTALA’s requirements (Abercrombie v Osteopathic Hosp. Founders Assn., 950 F2d 676, 681 [10th Cir 1991]; Reid v Indianapolis Osteopathic Med. Hosp., 709 F Supp 853, 855 [SD Ind 1989]). Since the intent to impose strict liability is clear defendant’s analysis of when strict liability may be implied is irrelevant (cf., Dance v Southampton, 95 AD2d 442).[4] EMTALA specifically declines to preempt State law (42 USC § 1395dd [f]), but, of course, that does not mean that the Federal statute must fit the careful strictures of State law.
Plaintiff contends that the "appropriate medical screening” required by EMTALA is not performed whenever there is an inaccurate emergency room diagnosis. He argues, in substance, that the Federal is a "strict liability” version of the State’s medical malpractice and negligence law. Certainly there are ambiguous terms in EMTALA. " 'Appropriate’ is one of the most wonderful weasel words in the dictionary, and a great aid to the resolution of disputed issues in the drafting of legislation. Who, after all, can be found to stand up for 'inappropriate’ treatment or actions of any sort?” (Cleland v Bronson Health Care Group, supra, 917 F2d, at 271.) The court declines to interpret the Federal statute so as to produce a result far beyond that intended — the transformation of "gar *367 den variety” malpractice cases into per se cause of action. Misdiagnosis should remain, as it was before EMTALA, a matter for State malpractice law. Rather the court concludes that the Federal courts have worked a reasonable accommodation between the Federal statute and State malpractice law and have fashioned a useful definition of "appropriate” under EMTALA. The determination of whether "appropriate medical screening” has occurred requires a finding of whether in this instance the hospital conformed to its standard screening procedures (see, Gatewood v Washington Healthcare Corp., supra, 933 F2d, at 1041; Cleland v Bronson Health Care Group, supra, 917 F2d, at 271; cf., Collins v DePaul Hosp., supra, 963 F2d, at 307). There is nothing in the statutory language which makes the motive of the hospital relevant; the question is simply whether the patient was denied the same level of care provided others (contra, Cleland v Bronson Health Care Group, supra, 917 F2d, at 272). Under the proper test the court cannot grant summary judgment to plaintiff or dismiss the action; the affidavits submitted, although not directed to the relevant test of "appropriateness”, appear to raise issues of fact.
One of the many ambiguities in EMTALA concerns when "stabilization” is required. The statute provides for "stabilization” if "the hospital determines that the individual has an emergency medical condition” (42 USC § 1395dd [b] [1]). At first blush, that language suggests that the hospital has no liability if it fails, for any reason, to determine the patient’s condition. However, the "transfer” rules imposed a far different standard. Under 42 USC § 1395dd (c) (1) if a patient "has an emergency medical condition which has not been stabilized (within the meaning of subsection (e) (4) (B)) [of this section] * * * the hospital may not transfer the patient”. However, "transfer” is defined to mean "the movement (including the discharge) of a patient outside a hospital’s facilities at the direction of any person employed by * * * the hospital” (42 USC § 1395dd [e] [5] [emphasis added]). A realistic, reasonable reading of the section leads inescapably to the conclusion that stabilization is required if the patient "has an emergency medical condition” even if that condition is not diagnosed.
The facts are in dispute whether Ms. Carodenuto was suffering from an "emergency medical condition” as the term is defined in 42 USC § 1395dd (e) (1). That is whether she had "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the ab *368 sence of immediate medical attention could reasonably be expected to result in — (A) placing the patient’s health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part.” That definition requires determination of many factors, such as the reasonable expectations of the results of failure to provide attention, which cannot be resolved by summary judgment on the basis of the conflicting affidavits submitted here. The affidavits are also in conflict on whether Ms. Carodenuto was "stabilized” as that term is defined in 42 USC § 1395dd (e) (4) (B); that is whether "no material deterioration of the condition is likely, within reasonable medical probability, to result from the transfer of the individual from a facility.” That standard is, indeed, most difficult to resolve by summary judgment (compare, Delaney v Cade, supra, 756 F Supp, at 1486).
Defendants also seek dismissal alleging that the claim is untimely. The Statute of Limitations under EMTALA is two years (42 USC § 1395dd [d] [3] [C]). The amendment to the complaint which added the EMTALA claim was served more than two years after the cause of action arose. No new facts were alleged in the amended complaint; "at most [the plaintiff] * * * sets forth [a new] theory of the law based upon the facts formerly alleged”. (Rife v Union Coll., 30 AD2d 504, 505). The EMTALA claim clearly relates back to the original claim and is not barred (Caffaro v Trayna, 35 NY2d 245; CPLR 203 [e]).
The defendants also claim that the notice of claim is deficient and it is too late to file one now. Clearly State procedural laws that govern the filing of actions against municipalities have not been preempted by EMTALA (Draper v Chiapuzio, 755 F Supp 331, 333 [D Ore 1991]). Thus, failure to file a notice of claim may be asserted as a bar to an EMTALA action. However, the issue here is whether the timely filed notice here may be corrected to compensate for the omission of the Federal claim. The original notice of claim alleged all of the relevant facts and nothing new is being asserted now. There is no way that defendants can successfully allege prejudice (Mayer v Dupont Assocs., 80 AD2d 799, 800). Defendants *369 had notice of the acts and have had control of the records since the incident occurred.
The motion for summary judgment is denied. The cross motion is granted only to the extent that claims against the individual defendants under EMTALA are dismissed.

. Despite subsequent renumbering and amendment, the references in this opinion are to the statute in effect at the time the cause of action accrued, November 1988.

. Of course, if the element of damages sought is unavailable under State law, such as negligent infliction of emotional harm under the circumstances of the case, the Federal statute is unavailing (DiGicomo v St. Joseph’s Hosp. & Health Ctr., 182 AD2d 1106).

. Defendants argue that EMTALA did not contemplate the creation of an independent State cause of action. There is simply no support in the statute, or in the cases which have interpreted it, to support that conclusion; indeed, the cases reach the opposite result (e.g., Thornton v Southwest Detroit Hosp., 895 F2d 1131, 1133 [6th Cir 1990]).

. Defendants argue that the statute permits suit only if the violation is "knowing”. Under the 1988 version of the statute, that defendants correctly argue should be applied, "knowing” only appears in the civil penalty section (42 USC § 1395dd [d] [2]) and not in the section defining the private cause of action (42 USC § 1395dd [d] [3]). The "knowing” standard is, simply, irrelevant.