Shemika A. BURKS, and PrimeCare Health Plan, Inc., Plaintiffs,

v.

ST. JOSEPH'S HOSPITAL, Defendant-Appellant,

WISCONSIN PATIENTS COMPENSATION FUND, Defendant-Respondent-Petitioner.

Supreme Court

*No. 97–0466. Oral argument May 27, 1999.—Decided July 8, 1999.*

(Also reported in 596 N.W.2d 391.)

For the defendant-respondent-petitioner there were briefs by *Paul J. Kelly, Linda V. Meagher* and *Schellinger & Doyle, S.C.,* Brookfield and oral argument by *Linda V. Meagher.*

For the defendant-appellant there was a brief by *Mary K. Wolverton & Peter F. Mullaney* and *Peterson, Johnson & Murray, S.C.,* Milwaukee and oral argument by *Peter F. Mullaney.*

¶ 1. DAVID T. PROSSER, J. The Wisconsin Patients Compensation Fund (Fund) seeks review of an unpublished court of appeals decision[1] reversing the circuit court's conclusion that the Fund does not provide coverage for violations of the federal Emer-

[1] *Burks v. St. Joseph's Hospital,* No. 97–0446, unpublished slip op. (Wis. Ct. App. Oct. 27, 1998).

gency Medical Treatment and Active Labor Act (EMTALA).[2] The issue presented is whether the Fund is required to provide excess coverage for damages resulting from a hospital's refusal or failure to provide medical treatment to a severely premature infant, an alleged violation of EMTALA.

## FACTS

¶ 2. On April 1, 1993, Shemika A. Burks (Burks) arrived at the emergency room of St. Joseph's Hospital in Milwaukee, complaining of cramps and contractions.[3] The time was approximately 6:40 a.m. Burks was about 22 weeks pregnant and not expecting to deliver until August 10, 1993, almost 19 weeks later.

¶ 3. One hour after she arrived, Burks gave birth to a baby daughter, Comelethaa, who weighed only 200 grams (approximately 7 oz.) and measured 11 inches long. The baby died at 10:15 a.m., two and a half hours after delivery.

¶ 4. In a subsequent lawsuit against the hospital, Burks alleged that her daughter was breathing and had a heartbeat at birth. She claimed the hospital staff denied her requests for medical assistance to the infant after birth and that the baby died in her arms.

¶ 5. St. Joseph's Hospital contended that it would not have been appropriate to resuscitate such a severely premature baby. In an affidavit filed later in the circuit court, Dr. Karlo Raab, a neonatologist at St. Joseph's Hospital, stated that "no attempt was made to resuscitate Shemika Burks' fetus" and that "resuscitation was not medically indicated for Shemika Burks'

---

[2] 42 U.S.C. § 1395dd.

[3] Burks was covered for any necessary treatment by her health insurer, PrimeCare Health Plan, Inc.

fetus and in fact is medically inappropriate for any fetus weighing 200 grams."

## PROCEDURAL HISTORY

¶ 6. On March 30, 1995, Burks and her health insurer, PrimeCare Health Plan, Inc., filed a complaint against St. Joseph's Hospital and the Wisconsin Patient Compensation Fund (Fund) in Milwaukee County Circuit Court. The complaint alleged three causes of action. First, Burks alleged that St. Joseph's Hospital, acting through its agents and employees, and vicariously through its staff physicians, was negligent in caring for her daughter. Second, Burks accused the hospital of negligent infliction of emotional distress. Third, Burks asserted a violation by the hospital of EMTALA by "refusing to provide treatment" for the baby, especially for refusing to resuscitate her.

¶ 7. On September 17, 1996, the Fund filed a motion for partial summary judgment, asking the circuit court to excuse the Fund from any liability for excess coverage on the third cause of action regarding EMTALA because the EMTALA claim was not a medical malpractice claim. The court heard the Fund's motion on October 21, 1996, and on- November 19, 1996, it issued a written decision which granted the motion.

¶ 8. Following the court's written decision, the parties entered into a stipulation and order for partial dismissal, which dismissed the first two causes of action in the complaint. Thereafter, the only claim that remained was the EMTALA claim against the hospital.

¶ 9. Because the circuit court had previously granted the Fund's motion for partial summary judgment determining that the Fund did not provide coverage for EMTALA violations, the Fund submitted

814

an order for judgment and judgment to the court, asking that the Fund be dismissed entirely from the case. The order for judgment and judgment were both entered on January 21, 1997. St. Joseph's Hospital filed a Notice of Appeal from a final judgment on February 10, 1997.

¶ 10. The court of appeals reversed the decision of the circuit court and concluded that the Fund must provide coverage for EMTALA violations. The majority opinion, authored by Judge Charles Schudson, relied primarily on Wis. Admin. Code § Ins 17.35(2)(a) which requires that a health care liability insurance policy include "[c]overage for providing or failing to provide health care services to a patient." Because the cause of action regarding a violation of EMTALA alleged that St. Joseph's Hospital failed to provide certain health care services to a patient, the court of appeals determined that such a violation should be covered by the Fund.

¶ 11. Judge Schudson also wrote a concurring and dissenting opinion, signaling that the issue was close and difficult. He stated that *McEvoy v. Group Health Cooperative*, 213 Wis. 2d 507, 570 N.W.2d 397 (1997), was the controlling authority. Judge Schudson argued that in *McEvoy* this court stated that chapter 655, the chapter under which the Fund operates, covers only medical malpractice claims. Because the remaining claim was for a violation of EMTALA, not a medical malpractice claim, the concurring/dissenting opinion would have affirmed the circuit court's entry of judgment in favor of the Fund.

¶ 12. We granted the Fund's petition for review to consider whether the Fund is required to provide excess coverage for damages resulting from a hospital's refusal or failure to provide care to a severely prema-

ture infant, an alleged violation of the EMTALA statute.

## ANALYSIS

¶ 13. We begin with a review of the state and federal statutory provisions at issue in this case.

¶ 14. The Wisconsin legislature created the Wisconsin Patients Compensation Fund in 1975. § 9, chapter 37, Laws of 1975.[4] The Fund was created "for the purpose of paying that portion of a medical malpractice claim which is in excess of the limits expressed in s. 655.23(4)[5] or the maximum liability limit for which the health care provider is insured, whichever limit is greater . . ." Wis. Stat. § 655.27(1). In other words, "Chapter 655 created the Fund to curb the rising costs of health care by financing part of the liability incurred by health care providers as a result of medical

---

[4] The Wisconsin Patients Compensation Fund is a subchapter of Wis. Stat. ch. 655, "Health Care Liability and Patients Compensation." Chapter 655 "regulates claims made against individual health care providers and entities providing health care services through their employees." *McEvoy v. Group Health Cooperative*, 213 Wis. 2d 507, 528, 570 N.W.2d 397 (1997).

[5] Wisconsin Stat. § 655.23(4) (1995–96) provides:

Health care liability insurance, self-insurance or a cash or surety bond under sub. (3)(d) shall be in amounts of at least $200,000 for each occurrence and $600,000 per year for all occurrences in any one policy year for occurrences before July 1, 1987, $300,000 for each occurrence and $900,000 for all occurrences in any one policy year for occurrences on or after July 1, 1987 and before July 1, 1988, and $400,000 for each occurrence and $1,000,000 for all occurrences in any one policy year for occurrences on or after July 1, 1988.

All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

malpractice claims." *Patients Compensation Fund v. Lutheran Hospital-LaCrosse, Inc.*, 223 Wis. 2d 439, 452, 588 N.W.2d 35 (1999). It is the responsibility of the health care provider to provide coverage for medical malpractice claims up to the amounts set out in § 655.23(4) through its own health care liability insurance, self-insurance, or a cash or surety bond.

¶ 15. Congress enacted EMTALA as part of the Comprehensive Omnibus Budget Reconciliation Act of 1985 (COBRA) to prevent "patient dumping"—i.e., refusing medical treatment or transferring indigent and uninsured patients from private to public hospitals to avoid the costs of treatment. *Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.*, 134 F.3d 319, 322 (5th Cir. 1998). EMTALA provides that hospitals that have entered into Medicare provider agreements[6] are prohibited from inappropriately transferring or refusing to provide medical care to "any individual" with an emergency medical condition. 42 U.S.C. § 1395dd(a).[7] It "places obligations of screening

---

[6] 42 U.S.C. § 1395dd(d)(1)(A) provides that "[a] participating hospital that negligently violates a requirement of this section is subject to a civil money penalty . . ." In addition, "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located . . ." 42 U.S.C. § 1395dd(d) (2)(A). "Participating hospital" is defined as a "hospital that has entered into a provider agreement under section 1395cc of this title." 42 U.S.C. § 1395dd(e)(2).

[7] 42 U.S.C. § 1395dd(a) provides:

(a)   **Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this

and stabilization upon hospitals and emergency rooms who receive patients suffering from an 'emergency medical condition.' " *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam).

¶ 16.   Under EMTALA, hospitals with emergency departments that have entered into Medicare provider agreements have two obligations. First, if any individual comes to the emergency department requesting examination or treatment, a hospital must provide for "an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a). Second, if the hospital "determines that the individual has an emergency medical condition," it must provide "within the staff and facilities available at the hospital" for "such treatment as may be required to stabilize the medical condition" and may not transfer such a patient until the condition is stabilized or other statutory criteria are fulfilled. 42 U.S.C. §§ 1395dd(b),[8] (c).[9]

---

subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

[8] 42 U.S.C. § 1395dd(b)(1) provides:

**(b)   Necessary stabilizing treatment for emergency medical conditions and labor**

**(1)   In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

# ¶ 17.   A person who "suffers personal harm as a direct result" of a hospital's failure to meet the require-

(A)   within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B)   for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

[9] 42 U.S.C. § 1395dd(c)(1) provides:

**(c)   Restricting transfers until individual stabilized**

**(1)   Rule**

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e) (3)(B) of this section), the hospital may not transfer the individual unless—

(A)(i)   the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

(ii)   a physician (within the meaning of section 1395x(r) (1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

(iii)   if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

(B)   the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

ments under EMTALA may bring a civil action seeking damages and appropriate equitable relief against the participating hospital. 42 U.S.C. § 1395dd(d)(2)(A).

¶ 18. The relationship between chapter 655 and EMTALA presents an important issue for this court. To what extent do these two statutes intersect? To what extent, if any, does a federal EMTALA claim come under Wisconsin's Patient Compensation Fund, so that the Fund is required to pay excess liability for an EMTALA violation?

¶ 19. The Fund asserts that its coverage is limited to medical malpractice claims and that a tort claim for medical malpractice under state law is separate and distinct from an EMTALA claim grounded in federal statute. Consequently, the Fund argues that it has absolutely no responsibility to cover any EMTALA violation.

¶ 20. The Fund cites *McEvoy v. Group Health Coop. of Eau Claire*, 213 Wis. 2d 507, 570 N.W.2d 397 (1997), to support its position. In *McEvoy*, this court examined the scope and application of chapter 655 to determine whether the chapter precluded Fund coverage for a "bad faith" tort claim against an HMO. In holding that such a claim was precluded, this court said that "an examination of the language of chapter 655 reveals that the legislature did not intend to go beyond regulating claims for medical malpractice." *Id.* at 529. "We conclude that ch. 655 applies only to negligent medical acts or decisions made in the course of rendering professional medical care." *Id.* at 530.

¶ 21. The Fund relies on several cases for the proposition that EMTALA is not a federal malpractice

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

act. *Brooks v. Maryland General Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993); *Reynolds v. Mercy Hosp.*, 861 F. Supp. 214, 219 (W.D.N.Y. 1994). A hospital's liability is not grounded upon tort concepts. *Griffith v. Mt. Carmel Medical Center*, 842 F. Supp. 1359, 1365 (D. Kan. 1994). EMTALA, the Fund argues, is a strict liability law created to prevent patient dumping, without any regard to whether malpractice occurred.

¶ 22. The Fund also claims that providing coverage under the Fund for EMTALA violations conflicts with *Rineck v. Johnson*, 155 Wis. 2d 659, 456 N.W.2d 336 (1990), which it says makes clear that for other statutes to apply to the Fund they must be specifically incorporated into chapter 655.

¶ 23. Finally, the Fund argues that it is error to conclude that Wis. Admin. Code § Ins. 17.35(2)(a),[10] and therefore chapter 655, applies any time there is liability for providing or failing to provide health care services to a patient, regardless of whether there is medical malpractice. The Fund asserts that § Ins 17.35(2)(a) applies to medical malpractice cases only, since the rule implements Wis. Stat. § 655.23. The rule is limited to what § 655.23 covers—insurance for medical malpractice claims.

---

[10] Wis. Admin. § Ins. 17.35 provides in part:

**Primary coverage; requirements; permissible exclusions; deductibles.** (1) PURPOSE. This section implements ss. 631.20 and 655.24, Stats., relating to the approval of policy forms for health care liability insurance subject to s. 655.23, Stats.

(2) REQUIRED COVERAGE. To qualify for approval under s. 631.20, Stats., a policy shall at a minimum provide all of the following:

(a) Coverage for providing or failing to provide health care services to a patient.

¶ 24. In sum, the Fund asserts EMTALA is a federal statute that "imposes two requirements on any hospital which participates in the Medicare program: (1) the hospital must conduct appropriate medical screening to persons visiting the hospital's emergency room; and (2) the hospital may not. . .transfer out of the hospital a patient whose medical condition has not been stabilized." *Brewer v. Miami County Hosp.*, 862 F. Supp. 305, 307 (D. Kan. 1994). A malpractice claim requires a violation of a standard of care. This requires negligence. An action under EMTALA requires proof of a violation of the federal statute, nothing more. Consequently, the Fund argues that *no* EMTALA violations come under the Fund.

¶ 25. St. Joseph's Hospital takes exactly the opposite position. It asserts that all violations of EMTALA must be covered by the Fund. "EMTALA claims are failure to treat claims," St. Joseph's argues. "They all involve allegations of inadequate or inappropriate medical care against hospitals that pay assessments to the Fund with the reasonable expectation of coverage for such claims." Respondent's Br. at 4. Because EMTALA claims are not unlike medical malpractice claims, St. Joseph's declares, the legislature intended to provide coverage for an allegation that a health care provider failed to examine or stabilize a patient.

¶ 26. St. Joseph's Hospital maintains that chapter 655 does not define "medical malpractice" and does not consistently refer to coverage only for "medical malpractice." It cites several examples of other language in chapter 655 such as Wis. Stat. § 655.017 (limitation on noneconomic damages applies to "damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a health care provider . . .") and § 655.27(1)

("The fund shall provide occurrence coverage for claims against health care providers that have complied with this chapter . . ."). It also asserts that because EMTALA is interpreted to incorporate state medical malpractice damage caps, the federal statute should also be interpreted to incorporate Wisconsin's requirement that the Fund cover claims against health care providers who comply with chapter 655.

¶ 27. St. Joseph's Hospital also cites Wis. Admin. § Ins 17.35(2)(a) in support of its position. According to St. Joseph's, because § Ins 17.35(2)(a) defines the minimum coverage a primary health care liability policy must contain, the Fund, which provides excess coverage, should not provide less coverage than the provider's primary insurer.

¶ 28. St. Joseph's Hospital distinguishes *Rineck* and *McEvoy*: *Rineck* did not say anything about the extent of the Fund's coverage obligations but instead held that the Fund supersedes any contrary rule in other statutes or the common law. *McEvoy* never addressed the extent of the Fund's coverage obligations or whether the Fund covers EMTALA claims but instead addressed the issue whether the denial of HMO benefits is a chapter 655 medical malpractice claim.

¶ 29. St. Joseph's Hospital points out that *McEvoy* dealt with an administrative decision to deny coverage for health care services, while this case involves an allegedly "improper medical action or decision" made in the course of rendering professional care. St. Joseph's stresses that this case is not an administrator's breach of contract, as in *McEvoy*, but a health care provider's medical decision that medical treatment was not appropriate and should not be rendered.

823

¶ 30. In sum, St. Joseph's asserts that the Fund was created to address the increase in claims arising out of the delivery of health care services. EMTALA claims arise out of the delivery or failure to deliver health care services. Hence, St. Joseph's argues that *all* EMTALA claims come under the Fund.

¶ 31. Both parties make compelling arguments, and both parties can point to cases from other jurisdictions to support their respective positions.

¶ 32. Our ultimate objective in this case is to interpret the scope of chapter 655, a Wisconsin statute. The interpretation and application of a statute presents a question of law that this court reviews *de novo*. *Patients Compensation Fund v. Lutheran Hospital*, 223 Wis. 2d at 454; *Wisconsin Patient Compensation Fund v. Wisconsin Health Care Liab. Ins. Plan*, 200 Wis. 2d 599, 606, 547 N.W.2d 578 (1996).

## PATIENTS COMPENSATION FUND

¶ 33. The Patients Compensation Fund provides excess coverage for medical malpractice claims. Wisconsin Stat. § 655.27(1) provides:

> There is created a patients compensation fund for the purpose of paying that portion of a *medical malpractice claim* which is in excess of the limits expressed in s. 655.23(4) or the maximum liability limit for which the health care provider is insured, whichever limit is greater, paying future medical expense payments under s. 655.015 and paying claims under sub. (1m). The fund shall provide occurrence coverage for claims against health care providers that have complied with this chapter, and against employes of those health care providers, and for reasonable and necessary expenses incurred

in payment of claims and fund administrative expenses. . . .(Emphasis supplied.)

¶ 34. In *McEvoy*, after citing five references to *malpractice* in the chapter, this court said: "We conclude that ch. 655 applies only to negligent medical acts or decisions made in the course of rendering professional medical care. To hold otherwise would exceed the bounds of the chapter and would grant seeming immunity from non-ch. 655 suits to those with a medical degree." *McEvoy*, 213 Wis. 2d at 530.

¶ 35. We know that chapter 655 applies only to medical malpractice claims, but this begs the question. What is a medical malpractice claim? Chapter 655 does not define medical malpractice. The Wisconsin Jury Instruction—Civil 1023 states that the standard to determine medical malpractice is "whether (doctor) failed to use the degree of care, skill, and judgment which reasonable (general practitioners) (specialists) would exercise given the state of medical knowledge at the time of the (treatment) (diagnosis) in issue."

¶ 36. The phrase "state of medical knowledge at the time of" in the instruction implies that the standard of care for general practitioners or specialists is constantly evolving as the state of medical knowledge advances. *Cf. Nowatske v. Osterloh*, 198 Wis. 2d 419, 438–39, 543 N.W.2d 265 (1996). The state of medical knowledge is not static. It may in certain circumstances require an understanding of statutory requirements. The Informed Consent Statute is one example. *See* Wis. Stat. § 448.30.

¶ 37. The failure to provide health care services can be a component of medical malpractice. Wisconsin Stat. § 655.005(1) refers to "damages for bodily injury or death due to acts or *omissions* . . ." and subsection (2) refers to "claims against the health care provider or the

employe of the health care provider due to the acts or *omissions* of the employe acting within the scope of his or her employment and providing health care services." (Emphasis supplied.) Wisconsin Stat. § 655.44(1) refers to persons having "a claim or a derivative claim under this chapter for bodily injury or death because of a tort. . .based on professional services rendered *or that should have been rendered* by a health care provider . . ." (Emphasis supplied.)

¶ 38.  Given this statutory language it makes perfect sense for Wis. Admin. § Ins 17.35(2)(a) to require that a health care liability insurance policy, providing the primary coverage for a health care provider, include "[c]overage for providing or failing to provide health care services to a patient."

¶ 39.  In *Steinberg v. Arcilla*, 194 Wis. 2d 759, 773, 535 N.W.2d 444 (Ct. App. 1995), the court of appeals accepted a jury instruction which read in part:

> A physician fails to exercise reasonable and ordinary care when, without intending to do any wrong, he does an act *or omits to act* under circumstances in which a physician ought reasonably to foresee that such action or *omission* will subject his patient to an unreasonable risk [of] injury or damage. (Emphasis supplied.)

This instruction is cited by this court in *Notwatske*, 198 Wis. 2d at 434–35 n.8.

¶ 40.  Medical malpractice includes omissions, failures to provide health care services, and professional services that should have been rendered when these deficiencies violate the standard of care required from a health care provider. The failure to provide health care services to a patient can, in appropriate circumstances, be negligence.

## EMTALA

¶ 41. The announced objective of EMTALA was to prohibit hospitals that receive Medicare funds from engaging in "patient dumping." Elizabeth Larson, Note, *Did Congress Intend to Give Patients The Right to Demand and Receive Inappropriate Medical Treatments?: EMTALA Reexamined in Light of Baby K*, 1995 Wis. L. Rev. 1425. "Patient dumping is the refusal by a hospital to provide necessary emergency medical treatment to someone based upon that person's inability to pay." *Id.*

¶ 42. While Congress may have intended to focus on the indigent and uninsured when it passed EMTALA, the language it used was conducive to a much broader interpretation. In recent years EMTALA has been construed to apply to all patients, irrespective of their ability to pay.[11] Most courts that have considered the question have ruled that EMTALA does not contain an express or implied "improper motive" requirement.[12] A person need not show any medical malpractice to prove an EMTALA violation. In fact, two courts have required medical treatment outside the

[11] *See, e.g., Collins v. DePaul Hosp.*, 963 F.2d 303, 308 (10th Cir. 1992); *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 414 (9th Cir. 1991); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991); *Cleland v. Bronson HealthCare Group*, 917 F.2d 266, 269–70 (6th Cir. 1990); *Deberry v. Sherman Hosp. Ass'n*, 741 F. Supp. 1302, 1303 (N.D. Ill. 1990).

[12] *See, e.g., Collins*, 963 F.2d at 308; *Brooker*, 947 F.2d at 414; *Gatewood*, 933 F.2d at 1040; *Deberry*, 741 F. Supp. at 1306. *See also Roberts v. Galen of Virginia, Inc.*, — U.S. —, 119 S. Ct. 685, 687, 142 L.Ed.2d 648 (1999).

prevailing standard of care, treatment that is at least arguably medically inappropriate.[13]

¶ 43.   In a persuasive article, Elizabeth A. Larson writes that even the fully insured may bring suit under EMTALA.

> However, with the element of economic discrimination absent from such a case, it is difficult to determine exactly what role EMTALA should play. The courts. . .have established a variety of tests for finding a violation in such cases. While these tests differ from one another, they share a common goal: to determine whether a particular hospital failed to adequately screen the patient for an emergency medical condition and, if such a condition was found, whether the hospital stabilized it before releasing or transferring the patient.
>
> *The goal of these tests is effectively indistinguishable from that of state malpractice laws: to determine whether the established standard of care was breached. But while the common law of malpractice takes individual factors into account, EMTALA is brief, vaguely written, and provides no guidance for determining a standard of care.*

Larson, 1995 Wis. L. Rev. at 1426–27 (emphasis supplied).

¶ 44.   Larson   writes   that   "The   majority rule. . .holds that EMTALA does not guarantee a cor-

---

[13] *In re Baby K*, 16 F.3d 590 (4th Cir. 1994); *In re Baby K*, 832 F. Supp. 1022 (E.D. Vir. 1993).

The *Baby K* case caused a sensation because the court held that to the extent that state law exempted physicians from providing care they considered medically inappropriate, it conflicted with EMTALA provisions requiring continuous stabilizing treatment for emergency patients and was thus preempted by EMTALA.

rect diagnosis and that EMTALA does not create a federal malpractice law. Despite the courts' claims, plaintiffs seem to have noticed that the majority rule does in effect create a federal malpractice law." *Id.* at 1457.

¶ 45. Larson is not the only commentator to suggest that EMTALA has made incursions into traditional areas of state malpractice law. Congress has created "a federal standard for emergency care." Scott B. Smith, *The Critical Condition of the Emergency Medical Treatment and Active Labor Act: A Proposed Amendment to the Act After In the Matter of Baby K*, 48 Vand. L. Rev. 1491, 1507 (1995). "COBRA's imposition of federal standards on the states represents a radical change from the status quo. Previously state and local governments generally determined the regulation of emergency care." Karen I. Treiger, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U. L. Rev. 1186, 1209 (1986).

¶ 46. "In the broadest terms, EMTALA imposes a legal duty on hospitals pertaining to the care and subsequent transfer of individuals with emergency medical conditions." Alicia Dowdy, et al., *The Anatomy of EMTALA: A Litigator's Guide*, 27 St. Mary's L.J. 463, 470 (1996). "Courts determining the standard of liability under EMTALA have looked to and applied the duties outlined by the statute itself. When a statute like EMTALA creates a duty of care, a violation of the statutory duty is categorized as 'negligence per se' or 'statutory liability.' " *Id.* at 489.

> EMTALA imposes a duty on hospitals regarding emergency department screening, actual knowledge of medical conditions, stabilization, and transfer, and courts have noted that the statute

itself describes the type of conduct required with respect to each of these provisions. Thus, in determining whether a hospital has departed from the statutorily imposed duties, courts reduce the statute to its elements and examine the duty of care for each element.

*Id.* at 489–90.

¶ 47. There is ample evidence that medical malpractice claims and EMTALA claims are being filed in the same lawsuit.[14] Multiple claims have been encouraged.[15] State and federal courts have concurrent jurisdiction over EMTALA claims.[16] "It is hornbook law that district courts have discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a common nucleus of operative facts." *Lopez-Soto v. Hawayek*, 988 F. Supp. 41, 46 (D.P.R. 1997) (citing 28 U.S.C. § 1367 and *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)), *reversed on other grounds*, 175 F.3d 170 (1st Cir. 1999).

¶ 48. EMTALA violations frequently have a malpractice element. *See, e.g., Power v. Arlington Hospital Assoc.*, 42 F.3d 851 (4th Cir. 1994); *Reid v. Indianapolis*

---

[14] *Collins*, 963 F.2d at 308; *Gatewood*, 933 F.2d at 1039; *Power v. Arlington Hosp.*, 800 F. Supp. 1384, 1389 n.15 (E.D. Va. 1992), *aff'd*, 42 F.3d 851 (4th Cir. 1994); *Coleman v. McCurtain Memorial Medical Management, Inc.*, 771 F. Supp. 343, 344 (E.D. Okla. 1991), *overruled by Collins*, 963 F.2d 303; *Deberry*, 741 F. Supp. at 1303; *Nichols v. Estabrook*, 741 F. Supp. 325, 326 (D.N.H. 1989); *Evitt v. University Heights Hosp.*, 727 F. Supp. 495, 498 (S.D. Ind. 1989).

[15] Mark R. Bower & Charles S. Gucciardo, *Proving A Separate Cause of Action in Malpractice Cases for Violation of the Federal "Anti-Dumping" Act*, VERDICTS, SETTLEMENTS & TACTICS, May 1994, at 147.

[16] 40A Am. Jur. 2d *Hospitals and Asylums* § 12 (1999).

*Osteopathic Med. Hosp., Inc.*, 709 F. Supp. 853, 855 (S.D. Ind. 1989); *Barris v. County of Los Angeles*, 972 P.2d 966, 972 (Cal. 1999).

¶ 49.   To illustrate, in *Power v. Arlington Hospital Assoc.*, 42 F.3d 851 (4th Cir. 1994), Susan Power came to the Arlington Hospital emergency room complaining of pain in her left hip, her lower left abdomen, and in her back running down her leg, and reported she was unable to walk, was shaking, and had severe chills. *Id.* at 853. She was eventually given some pain medication and dismissed after seeing two nurses and two physicians. *Id.* She returned to the hospital the next day in an unstable condition with virtually no blood pressure. *Id.* She was diagnosed as suffering from septic shock and immediately admitted into intensive care where she remained for over four months. *Id.* She eventually had both of her legs amputated below the knee, lost sight in one eye, and experienced severe permanent lung damage. *Id.* She was eventually transferred to a hospital in her hometown in England. *Id.*

¶ 50.   Power sued Arlington Hospital alleging that the hospital violated EMTALA by failing to provide her an "appropriate medical screening" when she initially arrived at the emergency room. *Id.* at 853–54. She also claimed that the hospital violated EMTALA by transferring her to the hospital in England while she was still in an unstable condition. *Id.* at 854. A jury returned a verdict in favor of Power on the appropriate medical screening claim and awarded actual damages of $5 million. *Id.* The jury found in favor of the hospital on the inappropriate transfer claim. *Id.*

¶ 51.   The hospital appealed, raising questions about the appropriate legal standard for recovery in an EMTALA claim and EMTALA's interrelationship with a Virginia statute that caps damages from medical

malpractice suits. *Id.* The hospital argued that the court of appeals should adopt a standard that requires proof of non-medical reason or an improper motive for a hospital's treatment or discharge decision before a plaintiff can recover for a breach of EMTALA. *Id.* at 856. The hospital also asserted that damages in the action should be limited by Virginia's malpractice damages cap. *Id.* at 860.

¶ 52.   With respect to the claim that proof of non-medical reason or improper motive is required for an EMTALA claim, the Fourth Circuit stated:

> [T]his is not a case in which the EMTALA claim is based solely on allegations that emergency room personnel failed to make a proper diagnosis. . . .Power has clearly presented evidence from which a jury could conclude that she was treated differently from other patients presenting to the Arlington Hospital emergency room, and that the Hospital did not apply its standard screening procedure, such that it was, uniformly. Although the facts might also give rise to a claim under state law for misdiagnosis or malpractice, that is not what Power has alleged or argued here. Her evidence is sufficient to meet the threshold requirement of an EMTALA claim, namely that the screening she was provided by Arlington Hospital deviated from that given to other patients.

*Id.* at 856–57 (citation omitted).

¶ 53.   The Fourth Circuit determined that "Power's EMTALA claim would be deemed a malpractice claim under the Virginia Medical Malpractice Act, despite the fact that it does not allege a breach of the prevailing professional standard of care generally associated with a malpractice claim." *Id.* at 861.

¶ 54.  *Power* demonstrates that the scope of EMTALA extends beyond a refusal to treat based on economic reasons. The argument that the hospital failed to screen Power for economic reasons was tenuous, yet the Fourth Circuit still recognized that a valid EMTALA claim existed. The potential scope of EMTALA is extremely broad, and is not limited to the refusal to provide care to persons without insurance. *See, e.g., Lopez-Soto v. Hawayek,* 175 F.3d 170 (1st Cir. 1999); *Summers v. Baptist Medical Center Arkadelphia,* 91 F.3d 1132 (8th Cir. 1996); *Carodenuto v. New York City Health & Hospitals Corp.,* 593 N.Y.S.2d 442 (N.Y. Sup. Ct. 1992).

¶ 55.  EMTALA claims are not limited to persons who are indigent and uninsured. Hospitals can violate EMTALA without improper motives by "negligently"[17] failing to satisfy the standards of emergency care established in federal law. Commentators have stated that EMTALA overlaps state malpractice law.[18] State malpractice law can include failure to provide health care services. Consequently, the conclusion is inescapable that at least some EMTALA violations are medical malpractice claims.

¶ 56.  Permitting the label on a cause of action to dictate whether a health care provider receives excess coverage from the Patients Compensation Fund would be elevating form over substance and negating the purpose of the Fund. Hence, we look to the test in *McEvoy* and hold that when a hospital's violation of EMTALA results from a negligent medical act or from a decision

[17] 42 U.S.C. § 1395dd(d)(1)(A) provides that "A participating hospital that *negligently* violates a requirement of this section is subject to a civil money penalty . . ."

[18] Larson, 1995 Wis. L. Rev. at 1457.

made in the course of rendering professional medical care, the Fund has an obligation to provide excess coverage. Conversely, when a hospital's violation of EMTALA results from an economic decision, the Fund has no duty to provide coverage.

¶ 57. In determining whether a violation of EMTALA was medically-based or economically-based, the first factor to consider is whether the patient had health care insurance coverage. The presence of insurance coverage permits the inference that the violation was not economically-based. The absence of coverage creates an implication that the violation may have been economically-based. Other factors to consider are whether the patient was given screening and other medical treatment, whether the screening was consistent with the usual practice at the hospital, whether a decision to transfer was made in consultation with another hospital, whether the action complained of resulted from the decision of a doctor or an administrator, and whether the patient has also made a malpractice claim.

¶ 58. Under the facts in this case, coverage under the Fund exists for Burks' claimed EMTALA violation. There was testimony that a medical decision was made not to treat Burks' newborn because medically the baby could not survive. In addition, several of the indicia described above existed in this case. Burks had medical insurance with PrimeCare Health Plan, Inc. Doctors made the decision not to treat Burks' newborn. This was not a case in which a non-medical administrator of the hospital made a decision not to treat based on economics. Burks began her suit claiming both an EMTALA violation and medical malpractice. Without reaching the merits of Burks' EMTALA violation claim,

we conclude that coverage under the Fund exists. Therefore, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 59. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*concurring*). I join the mandate of the majority opinion but write separately to state my disagreement with the conclusion that the Wisconsin Patients Compensation Fund has a duty to provide excess coverage for "medically-based" violations of the federal Emergency Medical Treatment and Active Labor Act (EMTALA), but not "economically-based" violations. The distinction drawn by the majority opinion was not raised or briefed by the parties, is unsupported by law and is unnecessary for the holding in this case.

¶ 60. The EMTALA claim in this case is, as the majority recognizes, a failure to treat within the definition of medical malpractice used in the majority opinion. *See* Majority op. at 825. Further, I conclude that the majority should hold, as St. Joseph's Hospital urges, that EMTALA claims are failure to treat claims arising out of the delivery of health care services. EMTALA imposes a legal duty of care on hospitals. Both EMTALA and the common law of medical malpractice establish standards of care, the breach of which gives rise to liability. The Wisconsin legislature intended the Fund to cover claims against hospitals alleging failure to provide appropriate medical treatment, regardless of whether the standard for treatment is set by common law or statute. Accordingly, I see no basis for the distinction made by the

835

majority opinion that would condition the Fund's duty to provide excess liability on whether a hospital's decision not to treat was a medical or economic decision.

¶ 61.    For the reasons stated, I concur.

¶ 62.   ANN WALSH BRADLEY, J. (*dissenting*). EMTALA is not a federal malpractice statute and is not designed to provide a federal remedy for general malpractice.[1] Because the majority concludes otherwise, I dissent.

¶ 63.    The legislative history to the act indicates that EMTALA was enacted to prevent " 'patient dumping,' which is the practice of refusing to treat [emergency care] patients who are unable to pay." *Marshall v. East Carroll Parish Hospital Service District*, 134 F.3d 319, 322 (5th Cir. 1998); *see* H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1985). As the Fourth Circuit explained, "[u]nder traditional state tort law, hospitals are under no legal duty to provide this [emergency] care." *Brooks v. Maryland General Hospital*, 996 F.2d 708, 710 (4th Cir. 1993). EMTALA imposed such a duty, but not one "to guarantee that all patients are property diagnosed, or even to ensure that they receive

---

[1] *See, e.g., Marshall v. East Carroll Parish Hospital Service District*, 134 F.3d 319, 322 (5th Cir. 1998); *Summers v. Baptist Med. Center Arkadelphia*, 91 F.3d 1132, 1136–37 (8th Cir. 1996) (en banc); *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996); *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995), *cert. denied*, 517 U.S. 1136 (1996); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255, 1258 (9th Cir. 1995); *Urban By and Through Urban v. King*, 43 F.3d 523, 525 (10th Cir. 1994); *Holcomb v. Monahan*, 30 F.3d 116, 117 & n. 2 (11th Cir. 1994); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1038–39 (D.C. Cir. 1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268, 272 (6th Cir. 1990).

adequate care." *Baker v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir. 1992).

¶ 64.   In direct contrast, this court has concluded that the Patients Compensation Fund "applies only to negligent medical acts or decisions made in the course of rendering professional medical care." *McEvoy v. Group Health Coop. of Eau Claire*, 213 Wis. 2d 507, 570 N.W.2d 397 (1997); *see also Wisconsin Patient's Compensation Fund v. WHCLIP*, 200 Wis. 2d 599, 607, 547 N.W.2d 578 (1996); *State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 499–500, 261 N.W.2d 434 (1978). As a result, "claims not based on malpractice, such as a bad faith tort action, survive application of [the] chapter" creating the Fund. *McEvoy*, 213 Wis. 2d at 530.

¶ 65.   In light of these cases, I can come to no other conclusion than this: EMTALA covers "patient dumping" but not medical malpractice, and the Fund covers medical malpractice but not "patient dumping." Burks' remaining claim was based on a violation of EMTALA. The court had already dismissed her two medical malpractice claims.

¶ 66.   Under our binding precedent combined with the persuasive precedent of other jurisdictions, the Fund is not an "excess liability insurance carrier" for causes of action stemming from an EMTALA violation. *Patient's Compensation Fund v. Lutheran Hospital*, 223 Wis. 2d 439, 452, 588 N.W.2d 35 (1999). Accordingly, I dissent.